UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| LORIE S. FARTHING, Administratrix of the Estate of JOHN DYLAN FARTHING, deceased, et al., | ) ) ) | Civil Action No. 5:20-CV-277-CHB |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **AND ORDER** |
| | ) | |
| BLUEGRASS REGIONAL RECYCLING CORPORATION, et al., | ) ) | |
| | ) | |
| Defendants. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by

Defendants Bluegrass Regional Recycling Corporation ("BRRC"), Michael Mills, Dewayne

Weaver, Darrell Neace, Mark Middleton, and Joseph Perry (collectively, the "BRRC

Defendants"), [R. 47], and the Motion for Summary Judgment filed by Defendant Timothy

Poynter. [R. 56]. Plaintiffs filed a response to both motions. [R. 63]. The BRRC Defendants and

Defendant Poynter have replied, [R. 67; R. 69]. This matter is therefore fully briefed and ripe for

review. For the reasons set forth below, the Court will grant in part and deny in part the BRRC

Defendants' Motion for Summary Judgment, [R. 47], and grant in part and deny in part

Defendant Poynter's Motion for Summary Judgment, [R. 56].

## I.  BACKGROUND

### A.  Reentry Centers

The Kentucky Department of Corrections ("KDOC") operates a "Reentry Center

Program." [R. 47-1, p. 1 (DOC Policies and Proc., Policy No. 25.14)]. Through this program, the

DOC may assign certain inmates to a reentry center. *Id.* at 2. A reentry center is defined as a

"supervised community residential facility operated by a local correctional facility, county jail, or regional jail." *Id.* at 1; Kentucky Revised Statute ("KRS") § 441.005(9). Such centers exist "for the purpose of diverting offenders from an institution or jail and reintegrating them into society." [R. 47-1, p. 2]. To this end, inmates are offered vocational training, counseling, and family outreach and community involvement programs, among other things. *Id.*; *see also* [R. 52, pp. 11:1-19 (Middleton Depo.)]; [R. 54, p. 14:7–19 (Mills Depo.)].[1]

Only inmates meeting certain criteria may be transferred to a reentry center. [R. 47-1, pp. 2–3]. For example, the inmate must have less than twelve months remaining on his or her sentence and must "[b]e physically and psychologically capable of functioning in the reentry center without ongoing professional intervention." *Id.* To ensure that this latter qualification is met, the DOC conducts a medical screening a few days prior to the inmate's transfer to a reentry center. [R. 48, p. 24:12–16, p. 25:12–17 (Neace Depo.)]. After an inmate has been transferred to a reentry center, the reentry center handles the inmate's "day-to-day minor medical needs." [R. 47-1, p. 8].

**B.  Bluegrass Career Development Corporation and its Healthcare Procedures**

The KDOC contracts with BRRC for the operation of a reentry center, the Bluegrass Career Development Corporation ("BCDC"), in Richmond, Kentucky. [R. 54, pp. 14:7–19 (Mills Depo.)]; [R. 47-2 (KDOC Contract)]. Defendant Mills is the Executive Director of BRRC, *see* [R. 54, p. 9:4–6 (Mills Depo.)], while four of the individual defendants work at BCDC in some capacity. Defendant Neace is the Director of BCDC, Defendant Weaver is the Assistant Director, Defendant Middleton is a phase coordinator, and Defendant Perry is a monitor. *See* [R. 48, p. 8:24–25 (Neace Depo.)]; [R. 49, p. 9:11–12 (Weaver Depo.)]; [R. 52, p. 9:6–7 (Middleton

---

[1] For ease of reference, the Court refers to the page number (and line numbers) listed on each deposition transcript, rather than the page number of the electronic filing.

Depo.)]; [R. 50, p. 15:19–21 (Perry Depo.)]. Defendant Poynter is not employed by BRRC or

BCDC; rather, he is employed by a healthcare provider that contracts with BRRC, as explained

below. *See* [R. 49, p. 60:22–25; 61:1–5 (Weaver Depo.)].

BCDC does not have medical staff on site at all times. *See, e.g.*, [R. 54, p. 26:4–5 (Mills

Depo.)]; [R. 54, p. 19:2–5 (Poynter Depo.)]. Instead, BRRC contracts with Advanced

Correctional Healthcare for healthcare services. [R. 47-3 (Contract)]. Pursuant to that contract,

Advanced Correctional Healthcare sends a "physician and/or mid-level practitioner [to] visit the

[BCDC campus] once every other week" to meet with inmates who need non-emergency

medical care. *Id.* at 3. To be seen at one of these visits, an inmate can place their name on a "sick

call" sign-up sheet by contacting Defendant Dewayne Weaver, Assistant Director of BCDC.[2]

[R. 49, p. 60:22–25; 61:1–5 (Weaver Depo.)]. Between the sick call visits, "the physician and/or

mid-level practitioner will be available by telephone to the [BRRC campus] on an on-call basis,

seven (7) days per week, twenty-four (24) hours per day." [R. 47-3, p. 3].

Pursuant to BCDC's Operations Manual, the reentry center also abides by certain KDOC

medical procedures for inmates. [R. 47-4, p. 2 (BCDC Operations Manual Excerpt)]. Pursuant to

these medical procedures, BCDC provides "routine outpatient, medical, dental, and medication

services for residents." *Id.* The medical procedures further provide that "common sense should

be used" to treat minor injuries (e.g., minor cuts, scrapes, burns, bruises), and such injuries may

"be handled with in-house first-aid kits." *Id.* at 5. On the other hand, inmates who are

unconscious, not breathing, or suffering from severe trauma (e.g., profuse bleeding, broken

bones, eye injuries, severe burns) should be sent to the emergency room; no prior authorization is

---

[2] Weaver is also described as the "medical liaison." *See, e.g.*, [R. 55, p. 18:7–10 (Poynter Depo.)]. However, Defendant Neace, the Director of BCDC, could also contact Poynter. [R. 48, p. 117:15–16 (Neace Depo.)].

required. *Id.*; *see also* [R. 49, p.; 53:4–13 (Weaver Depo.)]; [R. 54, p. 83:11–18 (Mills Depo.)]. However, if a resident complains of "non-injury illness or pain" that does not otherwise qualify as "severe trauma," prior authorization must be obtained from the BCDC Directors before the resident can be sent to the emergency room. [R. 47-4, p. 5]. In those cases, medical staff is called and advises the BCDC staff what measures to take. *Id.* The medical procedures further provide that "[r]esidents will be referred to the Facility Manager to determine the severity of their illness unless it appears to be an emergency." *Id.* at 2.

Thus, when a BCDC resident complains of "non-injury illness or pain," staff contacts a facility manager. *Id.* During the relevant time period, that person was Defendant Weaver. [R. 54, p. 82: 14–16 (Mills Depo.)]; *see also* [R. 49, pp. 51:2–11 (Weaver Depo.)]. Weaver would, in turn, contact Defendant Poynter, a nurse practitioner designated by Advanced Correctional Healthcare to respond to inquiries from BCDC. *See* [R. 49, p. 21:1–25, p. 51:2–11, p. 55:25, p. 56:1–5 (Weaver Depo.)]; [R. 54, p. 25:15–18 (Mills Depo.)]. Poynter would then advise Weaver as to whether the inmate required immediate emergency care or could be treated at the BCDC campus. [R. 55, p. 18:2–6 (Poynter Depo.)].

### C. John Dylan Farthing's Residency and Medical Care at BCDC

#### 1. December 2019 Arrival at BCDC

On December 3, 2019, John Dylan Farthing, a twenty-seven-year-old male, was transferred from a state prison facility to BCDC. [R. 47-5, p. 3 (Inmate Record Summary)]. He was assigned to pick up and dispose of trash (e.g., cigarette butts) from the BCDC parking lots. [R. 52, p. 89:3–10 (Middleton Depo.)]. This job was specifically assigned to Farthing because he suffered from a recently broken elbow that prevented him from participating in more physically demanding jobs. [R. 49, p. 42:12–25, p. 43:1–20 (Weaver Depo.)].

Shortly after arriving at BCDC, Farthing met with Weaver. *Id.* at 37:2–4. Weaver noticed that Farthing favored his right arm and asked him about it. *Id.* at 37:12–14. Farthing explained how his elbow had been injured and that he had not received any medical care for it at his detention center. *Id.* 37:17–19. Weaver told Farthing that he would schedule Farthing for a meeting with Poynter. *Id.* at 37:24–25, 38:3–8.

### 2. December 10, 2019 Medical Visit with Defendants Poynter and Weaver

On December 10, 2019, at approximately 10:41 a.m., Poynter saw Farthing during one of Poynter's campus visits. [R. 47-6 (Dec. 10, 2019 Med. Progress Note)]. Weaver was present during the exam and is present during all such medical appointments pursuant to the Prison Rape Elimination Act. [R. 49, p. 38:23–25, 39:1 (Weaver Depo.)].

Farthing told Poynter that he had broken his right elbow in July, but he had not received any medical attention for it at other detention facilities. [R. 47-6]; [R. 55, p. 25:17–25, 261:1–2 (Poynter Depo.)]. He complained of swelling in that arm and said he had trouble straightening his arm. [R. 55, p. 26:2–3 (Poynter Depo.)]; [R. 47-6]. He also asked Poynter for ibuprofen because "his arm hurt at times and he needed something for pain." [R. 55, p. 25:7–9 (Poynter Depo.)].

At that time, Poynter had not previously seen Farthing, and he did not have any of Farthing's medical records available to him. *Id.* at 24:12–25. Poynter therefore took a brief medical history of Farthing, asking, among other things, whether Farthing had ever used intravenous drugs or been diagnosed with hepatitis C or HIV. *Id.* at 25:9–13; [R. 49, p. 119:9–14, 122:7–17 (Weaver Depo.)]. Farthing responded in the negative to these questions. [R. 55, p. 25:13 (Poynter Depo.)]. Farthing apparently told Poynter that "he was healthy except for his

arm." *Id.* at 25:14–15. Poynter considered this to be a "focused visit . . . specifically for [Farthing's] right arm," so he did not take Farthing's vital signs. *Id.* at 27:23–25.

Poynter then examined Farthing's elbow and noted that Farthing could not fully extend his arm, and there was mild swelling and "a little bit of tenderness," but no sign of infection. *Id.* at 26:7–12, 26:22–23. Poynter determined that the elbow break had not healed properly and prescribed an anti-inflammatory painkiller, as well as Extra Strength Tylenol as needed. *Id.* at 26:13–21; [R. 47-6]; [R. 47-7 (Medication Administration Record)].

### 3. Other Interactions with Weaver after the December 10, 2019 Medical Visit

Sometime between January 7, 2020 and January 21, 2020, Farthing approached Weaver and said that he "was feeling sick" and was "feeling pretty bad," and he thought he had the flu. [R. 49, p. 78:25, 79:1, 80:14–25, 81:1 (Weaver Depo.)]. Weaver testified that Farthing looked "like he was not feeling well but not, like, extremely, extremely unwell." *Id.* at 81:2–4. Weaver responded, "No problem. We'll get you on the list to see the doctor." *Id.* at 79:1–2; *see also id.* at 81:4–6. Farthing was placed on the "sick call list" to see Poynter at his next visit to BCDC, which was scheduled for January 21, 2020. *Id.* at 78:10, 79:3. Weaver did not see Farthing again until that scheduled medical visit. *Id.* at 82:3–10, 84:4–12.

### 4. Fellow Resident's Observations after the December 10, 2019 Medical Visit

Curtis Lewis was a resident of BCDC during Farthing's stay at the reentry home. *See* [R. 63-1, p. 8:4–11 (Lewis Depo.)]. Lewis testified that he "brought [Farthing] up" to Defendants Weaver and Middleton, but "they wouldn't speak about nothing like that. All they would say is, yeah, we'll get the doctor here to take care of him." *Id.* at 21:18–23; *see also id.* at 43:10–17. It is unclear when any such conversations took place, though Lewis believed these conversations

- 6 -

occurred sometime after Farthing's December appointment with Poynter. *Id.* at 22:1–3, 43:18–25, 44:1–9.

Lewis also testified that he told Defendant Middleton "that [Farthing] wasn't looking good, and he really needed some help," to which Middleton replied, "Well, the doctor will be here," presumably referring to Poynter. *Id.* at 20:18–20. Lewis responded, "Well, I think he needs better help than the doctor." *Id.* at 20:22–23. Middleton then told Lewis that Farthing would be given medical attention at BCDC, and "[w]e'll take good care of him." *Id.* at 20:23–24. It appears this conversation with Middleton took place shortly before Farthing's January 21, 2020 medical visit with Poynter. *Id.* at 20:20–21, 21:6–13.

### 5.  January 20 or 21, 2020 Encounter with Defendant Perry

On January 20 or 21, 2020, Defendant Perry, a monitor at BCDC, was conducting his "rounds" of the BCDC campus. [R. 50, p. 70:8–17 (Perry Depo.)]. During his rounds, Perry would look for anything suspicious, ensure that all security measures were in place, and monitor the inmates, among other duties. *Id.* at 18:16–23, 19:23–25, 20:1–10. On the day in question, Perry observed Farthing standing in a central bay area speaking with another inmate. *Id.* at 70:17–20. Perry asked the inmates how they were doing, at which point Farthing responded that he was sick. *Id.* at 70:20–21. Perry did not ask any follow-up questions, and Farthing did not provide any details about his illness or request any assistance from Perry. *Id.* at 70:22–25, 71:1–7. He did not request to see Weaver or a doctor. *Id.* Perry testified that Farthing "looked as normal as he had ever looked when he was [at BCDC]," and he saw nothing unusual about Farthing's appearance. *Id.* at 72:7–15. Perry assumed that Farthing had "allergies or the flu or a cold . . . something like that. Something very minor," that would not "necessarily entail" a

doctor's visit. *Id.* at 71:7–11. Perry told Farthing that he hoped he would feel better soon, and he then continued making his rounds of the BCDC campus. *Id.* at 70:23–24.

### 6.    January 21, 2020 Medical Visit with Defendant Poynter

On January 21, 2020, at approximately 11:12 a.m., Poynter again attended to Farthing during one of Poynter's regular visits. [R. 47-8 (Jan. 21 Medical Progress Notes)]; [R. 55, p. 30:12–25, p. 31:1–3 (Poynter Depo.)]. Weaver was present during the exam. [R. 49, p. 83:18–20 (Weaver Depo.)]. Weaver testified that Farthing looked "mostly the same as the last time I saw him, but maybe he's just still—just still sick. You could tell that he had a cold or something." *Id.* at 84:1–3. However, Weaver also testified that "you could tell he was sicker" than when Weaver had last seen him. *Id.* at 113:9. He also testified that Farthing was "able to enter [the exam room] under his own power . . . but you could see that he was feeling flu-like symptoms and effects of someone that would, you know, have the flu." *Id.* at 113:9–14. For example, Weaver testified, Farthing was "really tired acting, how all of us would be if—if we had the flu." *Id.* at 114:15–16.

Poynter testified that, at this time, he "had prior knowledge that we had a flu-like illness at [BCDC]," and several inmates had been complaining of having low-grade fevers, coughing, chills, and "typical flu symptoms." [R. 55, p. 31:11–14 (Poynter Depo.)]. He further testified that "John Farthing was one of those" inmates. *Id.* at 31:14–15. Farthing specifically complained that he had "been sick for maybe a couple of weeks." *Id.* at 31:15–16; *see also* [R. 47-8]. He stated that he would cough until he vomited, but he "wasn't really sick at his stomach." [R. 55, p. 31:16–19 (Poynter Depo.)]. He also told Poynter that "he was achy all over and he ran a low-grade fever at times." *Id.* at 31:20–22. He also complained that he had experienced "some"

nausea, vomiting, and diarrhea, over the past week, as well as a decreased appetite. *Id.* at 33:10–18; [R. 47-8].

Poynter proceeded to check Farthing's vital signs "and got his temperature, got his blood pressure and pulse, and his oxygen saturation." *Id.* at 31:22–24; *see also* [R. 47-8]. Poynter testified that Farthing had a normal blood pressure ("low normal blood pressure") reading (101/53) and a slightly elevated pulse (124), which was "not inconsistent with somebody who's got the flu or running a low-grade fever." [R. 55, p. 32:9–16 (Poynter Depo.)]. Farthing's temperature (98.8 degrees) was also normal. [R. 47-8]. Poynter's notes also indicate that Farthing's "conjunctive was pink," which indicated that Farthing was not anemic; his "head, ears, nose, throat, [and] mucous membranes [were] moist"; he had a regular heart rate and rhythm; his abdomen was soft with positive bowel sounds; and his skin had normal turgor limits. [R. 47-8]; *see also* [R. 55, p. 34:18–25; p. 35:1–25; p. 36:1–2 (Poynter Depo.)]. Poynter noted that Farthing did not appear to be dehydrated. [R. 55, p. 36:4–10 (Poynter Depo.)]. Poynter also noticed that Farthing was "very pale," [R. 47-8], but that he had also been pale in December, and further, Farthing had "sandy, red hair and was very light complected." [R. 55, p. 36:11–21] (Poynter Depo.)]. Poynter again asked Farthing if he had used intravenous drugs, and Farthing responded in the negative. [R. 49, p. 119:4–17 (Weaver Depo.)].

Poynter further testified that he "assessed [Farthing] pretty thoroughly because when I listened to his lungs, he was wheezing a little bit." [R. 55, p. 31:24–25, 32:1 (Poynter Depo.)]. When Poynter told Farthing that he was wheezing, Farthing responded that he had asthma and "every time I get sick it makes my asthma flare up." *Id.* at 32:2–5. Poynter told Farthing that he had failed to mention his asthma, at which point Farthing responded, "Well, it only flares up when I get sick." *Id.* at 32:5–8.

Poynter ultimately determined that Farthing "likely had [the] flu." *Id.* at 37:15. Though flu tests were not available at BCDC, Poynter noted that four or five other residents had "very similar symptoms, and it was in the middle of flu season that year." *Id.* at 37:11–13. Poynter also testified that none of his diagnostic findings on January 21, 2023 were inconsistent with the flu. *Id.* at 37:16–21. Poynter prescribed a Z-Pak, Prednisone for the wheezing and asthma, and a nebulizer treatment, which would assist with breathing. *Id.* at 38:13–17. Poynter told Farthing to let Weaver know if his symptoms worsened or he was not feeling better within twenty-four to forty-eight hours. *Id.* at 48:10–14. Poynter testified that he believed Weaver heard these instructions. *Id.* at 48:15–18; *see also* [R. 49, p. 83:18–20, 111:15–17 (Weaver Depo.)].

### 7. January 23, 2020 Encounter with Matt Smith[3]

Around 2:00 or 3:00 a.m. on January 23, 2020, Matt Smith, a monitor at BCDC, was doing his rounds "counting inmates." [R. 53, p. 10:8–10, p. 12:7–9 (Smith Depo.)]. Smith saw Farthing "coming out of the bathroom" and had "a very brief conversation," maybe "about three sentences long." *Id.* at 10:7–8, 10–11. Smith greeted Farthing, at which point Farthing said, "I feel very sick." *Id.* at 10:17–20. Smith testified that "it sounded [like] his symptoms, like what he was telling me, he just had a cold," and "[i]t didn't appear to me that he was deathly ill." *Id.* at 10:21–23; *see also id.* at 23:1–2, 25:13–15. According to Smith, "I didn't at one time ever feel like . . . his sickness was life threatening." *Id.* at 23:7–8.

Smith then told Farthing, "Well, you need to speak with Darrell [Neace] and Dewayne [Weaver] tomorrow, as soon as they get in, in the morning . . . go talk to them and let them know." *Id.* at 10:24–25, 11:1–3. Though he could not remember exactly what was said, Smith testified that Farthing may have mentioned that he had already spoken with Neace and/or

---

[3] Plaintiffs repeatedly refer to Matt Smith as "Matt Baker" in its response brief. *See* [R. 63, p. 6].

Weaver. *Id.* at 11:5–17. Smith testified, "I think he said he had mentioned something to them about it, but . . . it wasn't along the lines of, well, I've told them a hundred times and they [have] not done anything about it." *Id.* at 11:13–17. He also testified that Farthing "never said that I've told Darrell [Neace] or Dewayne [Weaver], any of them multiple times." *Id.* at 13:2–7; *see also id.* at 17:23–25. Smith also testified that Farthing did not tell Smith that he needed to go to the doctor. *Id.* at 12:10–18. According to Smith's testimony, Farthing confirmed that he would speak with Neace and Weaver in the morning, then "walked on to bed." *Id.* at 11:1–4.

### 8. January 24, 2020 Encounter with Defendant Middleton

Around 8:00 a.m. on January 24, 2020, Farthing knocked on the office door of Defendant Mark Middleton, the Phase Coordinator at BCDC. [R. 52, p. 90:5–6 (Middleton Depo.)]. Middleton testified that he opened his door and saw Farthing "breathing very heavy and very quickly." *Id.* at 90:6–7. Farthing told Middleton, "Mark, I'm scared, I can't breathe." *Id.* at 90:8. Middleton testified that Farthing appeared panicked. *Id.* at 93:13. However, Middleton "didn't notice anything out of . . . the ordinary," and did not hear "any kind of gurgling, or wheezing, or any obstruction, or anything like that." *Id.* at 93:13–16.

Middleton then ask Farthing to sit with him at one of the dining tables right outside his office door because he was concerned that Farthing's heavy breathing could cause him to become dizzy and fall. *Id.* at 90:8–13. Middleton began talking to Farthing and trying to get him to slow down his breathing and breathe through his nose. *Id.* at 90:19–21. After a few tries, Farthing "started calming down" and "his breathing started to become more . . . natural and normal." *Id.* at 90:21–25. Middleton asked if Farthing would like a glass of water, and Farthing responded in the affirmative, so Middleton brought him a glass of water. *Id.* at 90:25, 91:1–3. Middleton told Farthing that if he wanted more water, he would get Farthing more. *Id.* at 91:3–4.

But when Farthing finished the glass of water, "he got up and went to the water fountain himself

and got more water and came back and sat." *Id.* at 91:4–7.

During the time that Middleton and Farthing were sitting at the table talking, fellow

resident Lewis was present in the dining area. [R. 63-1, p. 47:20–25 (Lewis Depo.)]. Lewis

testified that he told Middleton that "Farthing needs to go [to] the hospital. He needs some

medical attention . . . . He's not having a panic attack." *Id.* at 48:7–11. Lewis testified that

Middleton responded, "He's just having a panic attack. Calm down. Calm down." *Id.* at 48:11–

13. Middleton does not mention Lewis or this conversation in his deposition testimony, nor does

he expressly state that he believed Farthing was having a panic attack. *See generally* [R. 52

(Middleton Depo.)].

Middleton and Farthing continued talking, during which time Middleton texted Weaver

to "let him know what the situation was." *Id.* at 91:7–9. Middleton texted, "Farthing is stating he

can't breathe. He is panting quite a bit but is breathing." [R. 63-14 (Middleton Text Messages)].

Weaver responded,

> Well, here is the deal. When doc saw him doc requested he take 2 treatments a day
> for a few days. So, I told him to come back that day after lunch and we would start
> doing them. I never saw the kid again that day or since. It appeared to me he had
> elected not to do them as he has said nothing since doc came on Tuesday. Sharing
> [his breathing treatments] with [another resident]. . . bit gross.

*Id.* Weaver also advised that he would talk to Farthing once he (Weaver) arrived at BCDC. *Id.*

Defendant Neace was also included in that group text message with Middleton and

Weaver. *Id.*; *see also* [R. 52, p. 98:3–4 (Middleton Depo.)]. Neace did not respond to

Middleton's text message. [R. 52, p. 98:5–7 (Middleton Depo.)]. Neace testified that he was not

aware that Farthing was experiencing any medical difficulties that morning and had not had any

conversations with Weaver or Middleton about Farthing prior to his passing. [R. 48, p. 150:13–19, 151:8–10 (Neace Depo.)].

After texting with Weaver, Middleton continued to sit and talk with Farthing, and he testified that Farthing's "breathing did become normalized, well, I would call it normalized." [R. 52, p. 91:10–11 (Middleton Depo.)]. Weaver eventually arrived and took Farthing into his office. *Id.* at 91:12–13. Middleton did not go into Weaver's office with Farthing. *Id.* at 91:14–16.

At some point later that day, Middleton had a conversation with Farthing about switching his bed to the bottom bunk due to Farthing's seniority. *Id.* at 91:20–25, 92:1–3. Later, before leaving for the day, Middleton checked on Farthing. *Id.* at 92:10–11. Farthing advised that he was feeling better, but he felt worse at night. *Id.* at 92:10–13. Middleton suggested sleeping in an inclined position and found a blanket that Farthing could use for that purpose. *Id.* at 92:13–25. Farthing thanked Middleton, and Middleton left for the day. *Id.* at 93:3–4. Before leaving, Middleton told Perry, who was just arriving for his shift, about Farthing and advised Perry to "keep an eye out." *Id.* at 98:21–24.

### 9. January 24, 2020 Encounter with Defendants Weaver, Neace, and Mills

When Weaver arrived at the BCDC facility on the morning of January 24, 2020, he observed Middleton standing beside Farthing, who was seated on a bench in the dining room. [R. 49, p. 125:25, p. 126:1–2 (Weaver Depo.)]. Middleton advised Weaver that Farthing needed to speak with him, so Weaver brought Farthing into his office. *Id.* at 126:3–5. Weaver testified that, at this time, Farthing was walking "under his own power, unaided, unassisted." *Id.* at 126:6–7.

In Weaver's office, Farthing complained that he was still feeling sick. *Id.* at 126:8–9. He also told Weaver that he "was having issue just kind of getting his breath." *Id.* at 130:3–5.

Weaver spoke to Farthing about his medications, and Farthing advised that he had "taken the first dose," perhaps referring to the Z-Pak and/or prednisone. *Id.* at 126:9–11. Weaver then spoke to Farthing about the nebulizer treatment and inquired as to why Farthing had not yet come by Weaver's office to pick up the nebulizer. *Id.* at 126:13–20. Weaver then gave Farthing the nebulizer, and Farthing took one of the nebulizer treatments before leaving Farthing's office. *Id.* at 126:22–24. Farthing took the nebulizer with him to his resident dorm. *Id.* at 126:24–25.

Weaver testified that Farthing appeared to be in 'the same condition" as Weaver had observed during the medical appointment with Poynter on January 21, 2020. *Id.* at 127:8–13. He further testified that Farthing did not request to go to the hospital or see a doctor, nurse, or other medical professional. *Id.* at 127:14–22, 132:22–23. Because Farthing did not request to see a medical profession or go to the hospital, and because he did not appear to be having a medical emergency, Weaver did not call Poynter. *Id.* at 133:15–25, 134:1–25.

At some point during Weaver's conversation with Farthing, Neace entered Weaver's office and stood in the doorway. [R. 48, p. 152:22–25, 153:1–4 (Neace Depo.)]. He testified that, upon realizing that Weaver was in the middle of a conversation with Farthing, he left. *Id.* at 153:1–5.

### 10. January 24, 2020 Encounter with Defendant Perry

Later that evening, during the 9:00 p.m. headcount, Perry found Farthing standing at the end of his bunk. [R. 50, p. 90:1–8 (Perry Depo.)]. Perry observed that Farthing's "skin color was different" and he looked yellow. *Id.* at 90:11–13, 92:1–3. Perry testified that he "had no idea" what Farthing's yellow appearance meant; he "just knew it was serious." *Id.* at 92:4–7. Perry asked Farthing if he was okay, and Farthing responded that he was "really sick." *Id.* at 90:11–13. He advised Perry that he had "been sick for a while." *Id.* at 98:22. Perry told Farthing to meet

him at the monitor station after headcount. *Id.* at 90:14–15. When Farthing did not appear at the monitor station after headcount, Farthing looked on the security camera and observed Farthing standing in his bunk area, talking with another resident. *Id.* at 91:23–25. Perry called for Farthing over the intercom system, and Farthing made his way to the monitor station. *Id.* at 92:8–10. Perry observed Farthing walking to the station and testified that he did not appear to be having any trouble walking. *Id.* at 92:11–13.

When Farthing arrived at the monitor station, Perry asked him why he appeared yellow. *Id.* at 92:23–24. Farthing explained that he had been taking breathing treatments, but they had not been working, and he was having trouble breathing. *Id.* at 93:1–2. Perry testified that Farthing did not appear to be "gasping for breath or anything like that," but Perry "could see something was wrong, obviously, because he was yellow." *Id.* at 93:3–5. Farthing did not request to see Weaver, but Perry nevertheless told him that he (Perry) would contact Weaver "and see if we can get him to the hospital because something was wrong." *Id.* at 93:6–8. Perry told Farthing to return to his bunk area to relax and maybe drink some water, and that he would handle it from there. *Id.* at 93:8–11.

Perry called Weaver and advised that Farthing appeared yellow and was complaining that his breathing treatments were ineffective, and that he needed to go to the hospital. *Id.* at 99:25, 100:1–4. Weaver told Perry that he would contact Poynter. *Id.* at 100:7–8. After this call, a few residents approached Perry (perhaps after overhearing the phone call with Weaver) and told Perry that Farthing had been sick for a while and "[y]ou need to do something for him." *Id.* at 104:1–23.

Within approximately twenty minutes, Weaver called Perry back and told him to take Farthing to the hospital. *Id.* at 100:20–22. Approximately two minutes after ending the call, Perry

left BCDC with Farthing. *Id.* at 102:5–8. During their walk to the BCDC van, Perry observed

that Farthing "seemed perfectly normal," other than appearing yellow. *Id.* at 106:23–24. Farthing

was talking "fine" and "walking fine," and he was not coughing or gasping for breath. *Id.* at

106:24–25, 107:1. When they arrived at the hospital, which was only a short distance from

BCDC, Perry stayed with Farthing, stepping out of the exam room for privacy when necessary.

*Id.* at 108:7–14. However, the hospital eventually insisted that Perry wait outside. *Id.* at 108:25,

109:1–9. Perry then waited in the parking lot until he was relieved by another BCDC monitor,

around 11:00 p.m. *Id.* at 109:16–18.

### 11. Farthing's Passing on January 25, 2020

According to BCDC's Extraordinary Occurrence Report, Farthing was admitted to

Baptist Health Richmond at approximately 12:40 a.m. on January 25, 2020. [R. 47-10

(Extraordinary Occurrence Report)]. After administering multiple tests, the hospital staff

determined that Farthing had two "extremely damaged heart valves" and was in need of heart

surgery "as soon as possible." *Id.*

At approximately 5:01 a.m. on January 25, 2020, Farthing was transferred to the

University of Kentucky Hospital. *Id.* There, he was diagnosed with hepatitis C, pneumonia, and

septic endocarditis, an infection of the heart valves.[4] *Id.* A nurse stated that Farthing's "years of

drug abuse had caused the damage to his hearth valves," and the medical staff was "unable to

perform surgery on him because they could not get him in stable condition." *Id.* At 3:00 p.m. on

January 25, 2020, Perry contacted the hospital to check on Farthing and was told that Farthing

---

[4] Bacterial endocarditis is "an infection of bacteria that's introduced into the bloodstream and that become[s] lodged on heart valves and causes severe illness and death." [R. 55, p. 39:3–5 (Poynter Depo.)]; *see also* [R. 63-15, p. 2 (Blondell Opinion) ("Endocarditis is an infection of the valve and/or the internal lining of the heart; individuals who inject drugs are at risk for these infections.")]; *Britt v. Hamilton Cnty.*, 531 F.Supp.3d 1309, 1321 (S.D. Ohio 2021) (defining endocarditis as "an infection in the lining of the heart, usually a heart valve, that has long been recognized to be greatly increased among intravenous drug users").

had passed away at 2:36 p.m. from septic endocarditis. *Id.* Farthing's death certificate lists his cause of death as pericardial tamponade due to septic endocarditis, which in turn was due to intravenous drug use. [R. 47-11 (Death Certificate)]; *see also* [R. 56-16 (Autopsy Report)].

### D.  The Present Lawsuit

On June 27, 2020, the administratrix of Farthing's estate and his minor daughter, acting through her mother and next friend, brought suit in this Court. [R. 1]. They name as defendants BRRC, Mills, Weaver, Neace, Middleton, Perry, and Poynter.[5] *Id.* Against these defendants, Plaintiffs raise the following claims: a claim under 42 U.S.C. § 1983 for deliberate indifference to Farthing's serious medical needs[6] in violation of the Eighth and Fourteenth Amendments (Count I); negligence and gross negligence (Count II); and wrongful death under Kentucky Revised Statute ("KRS") § 411.130. *Id.* at 7–8. Plaintiffs also include a claim (Count IV), asserting that Farthing's minor daughter "has been unjustly deprived of her father's love, society, companionship, and support, for which she is entitled to recover damages." *Id.* at 8. The Court understands this to be a loss-of-parental-consortium claim brought under Kentucky law. *See generally Johnson v. Basil as Next Friend of Johnson*, 584 S.W.3d 777, 782 (Ky. Ct. App. 2019) ("[A] loss of parental consortium claim is a common-law cause of action.").

Over the next two years, the parties proceeded with discovery. The BRRC Defendants have now filed a Motion for Summary Judgment, [R. 47]. Defendant Poynter also filed a Motion

---

[5] Plaintiffs also named "The Nurse at the Bluegrass Career Development Center in January 2020 (Name Unknown)," but have not identified or served any such individual.

[6] While Plaintiffs refer to "cruel and unusual punishment" in Count I, *see* [R. 1, ¶ 20], the Court understands this to be a claim for deliberate indifference to a serious medical need. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243–44 (1983) ("The Eight Amendment's proscription of cruel and unusual punishments is violated by 'deliberate indifference to serious medical needs of prisoners.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976))).

for Summary Judgment, [R. 56]. Those motions are fully briefed and ripe for review. [R. 63; R. 67; R. 69].

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a

genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Further, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III. ANALYSIS

### A. Plaintiffs' Claims Against Defendant Michael Mills and Plaintiffs' Deliberate Indifference and Gross Negligence Claims Against Defendant Poynter

In their response brief, Plaintiffs "concede that discovery in this case has not sufficiently supported their claims against Defendant Mills." [R. 63, p. 14, n.83]. Plaintiffs also "concede that discovery has not sufficiently supported their federal claim under 42 U.S.C. §1983 that Poynter was deliberately indifferent to Farthing's serious medical needs, or their state claim that

he was grossly negligent." *Id.* p. 9, n.58. As explained in more detail below, the Court is dismissing all of Plaintiffs' state law claims without prejudice. *See infra* Section II(D). Because Plaintiff concedes its federal claims against Mills and Poytner, the Court will also grant the BRRC Defendants' Motion for Summary Judgment, [R. 47], to the extent they seek dismissal of the § 1983 claim against Defendant Mills, and Defendant Poynter's Motion for Summary Judgment, [R. 56], to the extent he seeks dismissal of the § 1983 deliberate indifference claim.

### B. Plaintiffs' § 1983 Deliberate Indifference Claim Against the BRRC Defendants in Their Individual Capacities

Plaintiffs allege that the remaining individual BRRC Defendants (Neace, Weaver, Middleton, and Perry) are liable under Count I, the § 1983 claim, for showing deliberate indifference to Farthing's serious medical needs in violation of his Due Process Rights under the Eighth Amendment.[7] [R. 1, p. 7]. To prevail on a § 1983 claim, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 384 (6th Cir. 2018) (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015)) (internal quotation marks omitted). The second of these requirements is uncontested in this case.[8] At

---

[7] Plaintiffs cite to both the Eighth and Fourteenth Amendments. [R. 1, p. 7]. The Eighth Amendment provides protection to incarcerated inmates like Farthing, while the Fourteenth Amendment's Due Process Clause provides similar protections to pre-trial detainees. *See Revere*, 463 U.S. at 244; *see also* [R. 47-5 (Inmate Record Summary identifying Farthing as an inmate)]. On this point, the Court notes that, until recently, a pretrial detainee's Fourteenth Amendment deliberate indifference claims were evaluated under the same objective-subjective test as an inmate's Eighth Amendment deliberate indifference claims. *See, e.g., Phillips v. PTS of America, LLC*, No. 3:17-CV-603-CHB, 2021 WL 1220997, at *7–8 (W.D. Ky. 2021). However, the Sixth Circuit recently modified the test that applies to pretrial detainees. *See Brawner v. Scott Cnty, Tenn.*, 14 F.4th 585, 596 (6th Cir. 2021). To the extent this Court cites to cases involving pretrial detainees, such cases were decided prior to that change in law, and those courts therefore applied the same objective-subjective test that applies in the present case.

[8] In their response brief, Plaintiffs argue that the individual BRRC Defendants are private actors, not public officials or employees, and as a result, they are not eligible for qualified immunity. [R. 63, pp. 25–26]. Importantly, the Plaintiffs raise this issue only in the section of their response brief that addresses their state law claims and only in the context of qualified immunity. *Id.* Plaintiffs do *not* address the BRRC Defendant's alleged status as private actors in the context of her § 1983 claims. *Id.* at 23. And the defendants do not argue that the § 1983 claim must fail because they are purely private actors. *See* [R. 47; R. 69]. The Court therefore understands that the parties do not

issue, however, is whether the remaining individual BRRC defendants violated Farthing's Eighth Amendment rights.

The Eighth Amendment prohibits an official from "unnecessarily and wantonly inflicting pain" on an inmate by acting with "deliberate indifference" toward the inmate's serious medical needs. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *North*, 754 F. App'x at 384. Accordingly, an official's deliberate indifference violates an inmate's constitutional rights when the official intentionally denies or delays access to medical care for a serious medical need. *North*, 754 F. App'x at 385 (citing *Estelle*, 429 U.S. at 104–05).

A deliberate indifference claim has both an objective and subjective component. *Id.* (citations omitted). The Court discusses each component in turn.

### 1. Objective Element (Serious Medical Need)

Under the objective component, there must be a "sufficiently serious" medical need. *Id.* (quoting *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008)) (internal quotation marks omitted). To satisfy this element, "a plaintiff must identify a serious medical need, which is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Martin v. Warren Cnty., Ky.*, 799 F. App'x 329, 338 (6th Cir. 2020) (quoting *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotation marks omitted)); *see also North*, 754 F. App'x at 385.

As previously noted, Farthing passed away due to endocarditis. *See* [R. 47-11 (Death Certificate)]; [R. 56-16 (Autopsy Report)]. Endocarditis is "an infection of bacteria that's

---

dispute that the BRRC Defendants were acting under color of state law for purposes of the federal claim and are therefore subject to suit under § 1983.

introduced into the bloodstream and that become[s] lodged on heart valves and causes severe illness and death." [R. 55, p. 39:3–5 (Poynter Depo.)]. The defendants do not dispute that this illness qualifies as an objectively serious medical condition that satisfies the objective prong. *See generally* [R. 47]. Accordingly, the Court turns to the subjective element of the deliberate indifference test. *See generally North*, 754 F. App'x at 387 (noting that parties did not dispute that endocarditis was an objectively serious medical condition and therefore turning to the subjective prong); *Kosloski v. Dunlap*, 347 F. App'x 177, 179 (6th Cir. 2009) ("Because the parties do not dispute that endocarditis is an objectively serious condition, [the defendant's] subjective mental state is the determinative issue.").

## 2. Subjective Element (State of Mind)

Under the subjective component, the plaintiffs "must show that [the defendants] had a 'sufficiently culpable state of mind.'" *North*, 754 F. App'x at 385 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "A defendant has a sufficiently culpable state of mind if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Winkler v. Madison County*, 893 F.3d 877, 891 (quoting *Farmer*, 511 U.S. at 837). The Sixth Circuit has explained that "[t]his means that 'the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). Thus, to satisfy this subjective element, the evidence must demonstrate that (1) the individual defendant subjectively perceived facts from which to infer a substantial risk to the inmate; (2) he or she did in fact draw that inference; and (3) he or she then disregarded that risk. *North*, 754 F. App'x at 385; *see also Jackson v. Wilkins*, 517 F. App'x 311, 317 (6th Cir. 2013) (citation omitted).

However, "[a] plaintiff need not show that the defendant acted with the very purpose of causing harm," though he "must show something greater than negligence or malpractice." *Winkler*, 893 F.3d at 891 (citing *Farmer*, 511 U.S. at 835); *see also North*, 754 F. App'x at 385 ("Deliberate indifference is greater than negligence but does not require proof that the officials intended to cause harm." (citation omitted)). Accordingly, the standard for this subjective element "has generally been equated with one of 'recklessness.'" *Winkler*, 893 F.3d at 891 (quoting *Farmer*, 511 U.S. at 836); *see also Love v. Taft*, 30 F. App'x 336, 338 (6th Cir. 2002) ("A prison official is deliberately indifferent when he acts with criminal recklessness, a state of mind that requires that he act with a conscious disregard to a substantial risk of serious harm to the prisoner." (citing *Farmer*, 511 U.S. at 837)).

Importantly, this subjective element "must be addressed for each [defendant] individually." *Burwell v. City of Lansing, Mich.*, 7 F. 4th 456, 466 (6th Cir. 2021). Thus, the Court must consider the individual defendants' conduct "based on the information that was available to them at the time," and "information available to one defendant may not be automatically imputed to the other[]" defendants." *Id.* (quoting *Rouster v. County of Saginaw*, 749 F.3d 437, 453, 447 (6th Cir. 2014)). Ultimately, the evidence must demonstrate that the individual defendant was personally "aware of facts from which he or she could infer a substantial risk of serious harm." *Winkler*, 893 F.3d at 891. As noted above, the evidence must also demonstrate that the individual defendant did, in fact, draw that inference and then consciously disregarded the risk of harm. *See, e.g.*, *North*, 754 F. App'x at 385.

Courts have recognized that defendants may "not readily admit this subjective component." *Id.* (quoting *Phillips v. Roane County*, 534 F.3d 531, 540 (6th Cir. 2008)). However, "a defendant's denial of knowledge is not dispositive." *Id.* (citation omitted). Instead,

"courts may 'infer from circumstantial evidence that a prison official had the requisite knowledge.'" *Id.* (quoting *Phillips*, 534 F.3d at 540). Thus, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Winkler*, 893 F.3d at 891 (quoting *Farmer*, 511 U.S. at 842) (internal quotation marks omitted); *see also North*, 754 F. App'x at 385 ("The 'very fact that the risk was obvious' may permit a factfinder to conclude that an official was aware of it." (quoting *Farmer*, 511 U.S. at 842)). Further, a plaintiff is "not required to prove that the defendant was aware of the exact nature or consequences of the defendant's actions or failure to act; demonstrating that the defendant was aware of the [inmate's] condition and knew that 'serious risks accompany' it is sufficient." *North*, 754 F. App'x at 385–86 (citation omitted).

Turning to the parties' arguments, the Court again notes that, to satisfy the subjective element, the evidence must demonstrate that (1) the individual BRRC defendant subjectively perceived facts from which to infer a substantial risk to the inmate; (2) he did in fact draw that inference; and (3) he then disregarded that risk. *Id.* at 385. However, Plaintiffs argue that the only question at the summary judgment stage "is whether the [BRRC] Defendants "*could* have perceived a substantial risk of harm to [Farthing]." [R. 63, p. 16 (quoting *Clark-Murphy v. Foreback*, 439 F.3d 280 (6th Cir. 2006) (emphasis added)]. With respect to the second and third factors—whether the defendants did, in fact, draw the inference of a substantial risk and then disregarded that risk—Plaintiffs argue that these issues must be reserved for trial. [R. 63, pp. 16–17].

For support, Plaintiffs cite to a single case, *Clark-Murphy v. Foreback*, 439 F.3d 280. In that case, the Court found that, for summary judgment purposes, some of the defendants were aware of facts from which they could have perceived a substantial risk of harm to the inmate. *Id.*

at 290. The Court stated, however, that "[w]hether in fact they perceived, inferred or disregarded that risk is an issue for trial." *Id.* (citations omitted). From this single statement, Plaintiffs seem to argue that the only question that may be resolved at the summary judgment stage is whether the BRRC Defendants subjectively perceived facts from which they could infer a substantial risk. [R. 63, p. 16]. Having reviewed the *Clark-Murphy* case, however, this Court understands that the Sixth Circuit was merely concluding that a genuine issue of fact remained *in that case* with respect to the second and third factors. Further, the cases cited in *Clark-Murphy* do not support Plaintiffs' interpretation of the quoted statement from that case. *See Farmer*, 511 U.S. at 842; *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). And lastly, courts have consistently granted summary judgment in favor of defendants where there was no genuine dispute of fact that the defendants did not, in fact, infer a substantial risk of harm or did respond reasonably to that risk. *See, e.g.*, *Britt*, 531 F.Supp.3d at 1330; *Winkler*, 893 F.3d at 892, 898; *Abram v. Corizon Health, Inc.*, No. 14-cv-11431, 2015 WL 4460961, *6 (E.D. Mich. July 21, 2015).

Having clarified the law on this subjective component, the Court now considers whether the individual BRRC defendants (1) subjectively perceived facts from which to infer a substantial risk to Farthing; (2) did in fact draw that inference; and (3) then disregarded that risk. *Jackson*, 517 F. App'x at 317.

### a. Defendant Darrell Neace (Director of BCDC)

The BRRC Defendants argue that Neace, in his administrative position as Director of BCDC, had only limited interactions with (or about) Farthing, and there is no evidence to suggest that Neace was informed about Farthing's illness. [R. 47, pp. 18–19]. Defendants specifically point to Neace's deposition testimony, in which he explained that he spent only two or three hours a week at the BCDC facility, with the remainder of his work week focused on

performing tasks off campus (e.g., picking up parts, gathering supplies, running errands). *Id.* at 18; [R. 48, p. 37:17–22 (Neace Depo.)].  He also testified that his position as director did not involve "any sort of medical responsibilities." [R. 48, p. 162:20–22 (Neace Depo)]. If he believed an inmate needed medical attention, he would refer the inmate to Weaver, who in turn acted as the medical liaison between BCDC and Poynter. *Id.* at 39:21–25, 40:1–3.

Neace also testified that his interactions with Farthing were limited. *Id.* at 76:3–5, 149:6–9.  He testified that he only spoke with Farthing one time, and they merely exchanged pleasantries when passing in the hallway. *Id.* at 149:6–9. He saw (but did not speak to) Farthing on one other occasion, when Neace entered Weaver's office on the morning of January 24, 2020. *Id.* at 152:22–25, 153:1–5. Neace testified that he saw Weaver was busy speaking with Farthing, so he promptly left Weaver's office. *Id.* at 153:1–5. Based on this evidence, Defendants argue that "Neace was not aware of any facts from which he could have concluded that Farthing had serious medical needs." [R, 47, p. 18].

In their brief, Plaintiffs devote only two sentences in response to Defendant's arguments about Neace. [R. 63, p. 20]. They argue that (1) "Farthing told [Smith] early Thursday morning that he'd told Neace multiple times that he was very sick and needed a doctor, with no success," and (2) Lewis "testified that he told Neace himself that Farthing was sick and needed help, and saw Farthing walk into Neace's office with Weaver Friday morning." *Id.*

When making these statements, Plaintiffs fail to cite to the portion of the record upon which they rely. However, the Court understand that, with respect to their statement about Smith, Plaintiffs are relying entirely on a May 2020 Facebook message sent by Smith. [R. 63-13, p. 2 (Smith Facebook Message)]. In that message, Smith described his January 23, 2020 conversation with Farthing as follows:

> We had a small conversation. Where he said he was very sick. Needed to go to the doctor. I told him he needed to let [Weaver] and [Neace] know asap. He said then that he had multiple times told them. I told him to bug them to death until they sent him.

*Id.* But in relying on this message, Plaintiffs completely overlook Smith's deposition testimony. In his deposition, Smith adamantly denied that Farthing said he needed to see a doctor. [R. 53, p. 12:10–18 (Smith Depo.)]. He also denied that Farthing told him that he had contacted Weaver and Neace multiple times. *See, e.g.*, *id.* at 17:23–24 ("I can recall that he never said that I've been telling them for multiple weeks at a time or anything like that."). He did not deny sending the above-quoted Facebook message, but he explained its contents as follows: "Honestly, here's probably what happened, him making that mention to me probably made me feel like that he had said something multiple times and that's probably why I put that in [the Facebook message]." *Id.* at 20:5–8.

Plaintiffs next refer to fellow BCDC resident Lewis's testimony but again fail to cite to those portions of the record upon which they rely. Having reviewed Lewis's deposition testimony, [R. 63-1 (Lewis Depo.)], the Court finds that Plaintiffs' characterization of Lewis's testimony is not supported by the record. First, Plaintiffs state that Lewis "testified that he told Neace himself that Farthing was sick and needed help." [R. 63, p. 20]. This is incorrect. When asked, "Who was it that you had conversations with about Mr. Farthing," Lewis testified that he "brought [Farthing] up" to both Middleton and Weaver; he does not mention Neace. *Id.* at 20:1–11–12. When specifically asked if he ever had any conversations with Middleton, Weaver, Neace, or Mills about Farthing, Lewis says only that be "brought [Farthing] up" to Weaver and Middleton; he does not mention any conversation with Neace. *Id.* at 21:18–20. Later in his deposition, he is asked if he ever had any conversations with Neace during his residency at BCDC. *Id.* at 37:7–9. He responds in the affirmative, but discusses only one conversation, which

took place after Farthing's death and involved a disciplinary restriction placed on Lewis. *Id.* at 37: 12–19. Lewis is also asked if he ever had any conversations with Neace about the medical care provided to BCDC residents, and Lewis responds, "I don't think I ever did. I think most of that was through [Weaver]." *Id.* at 15–19. The Court is not aware of any testimony from Lewis (nor do Plaintiffs cite to any) suggesting that Lewis ever spoke with Neace about Farthing, much less told Neace that Farthing "was sick and needed help," as Plaintiffs represent. [R. 63, p. 20].

Plaintiffs next state that Lewis testified that Lewis "saw Farthing walk into Neace's office with Weaver Friday morning." *Id.* Lewis did testify that, Farthing "come from [Weaver's] office, went to Darrell's office," and it is possible Lewis is referring to the morning of January 24, 2020, when Farthing went into Weaver's office after speaking with Middleton. [R. 63-1, p. 17:6–7]. Lewis later clarifies, "I overheard [Farthing] talking to [Middleton]. . . . I kind of heard a little bit of the conversation in [Weaver's] office. [Weaver] said he had to wait until [Neace] got there. [Neace] comes in." *Id.* at 18:2–7. But even assuming Farthing then went to Neace's office—a fact that is not clear from Lewis's testimony nor corroborated by any other evidence—there is no evidence that Farthing spoke with Neace about his illness or any other concerns. In fact, Lewis admitted that he did not hear any conversation between Neace and Farthing, and he was not sure if Farthing spoke with Neace. *Id.* at 18:6–7, 20:2–5, 60:23–25, 61:1–2.

Plaintiffs apparently rely on these various portions of the record to argue that Neace perceived facts from which he could infer that Farthing was seriously ill, but as already explained, Plaintiffs' argument is not supported by the record. The above-cited portions of the record do not demonstrate that Neace was aware of any concerns relating to Farthing, much less facts that would support an inference that Farthing was at substantial risk of suffering serious

harm. And Plaintiffs cite to no other evidence to support its argument regarding Neace. The Court therefore finds that the Plaintiffs have failed to satisfy their burden of identifying "specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d at 655 (emphasis added); *see also Colston v. Regency Nursing, LLC*, No. 3:16-cv-0050-GNS, 2018 WL 775367, *4 (W.D. Ky. Feb. 7, 2018).

Even looking beyond the evidence cited by Plaintiffs, the Court finds that the evidence of record does not demonstrate that Neace perceived facts from which he could infer a substantial risk of serious harm to Farthing, that he drew such an inference, and that he disregarded the risk. On this point, the Court notes that Middleton texted both Weaver and Neace on the morning of January 24, 2020, explaining that "Farthing is stating he can't breathe. He is panting quite a bit but is breathing." [R. 63-14 (Middleton Text Messages)]. Weaver responded and explained that he would speak with Farthing. *Id.* Neace did not mention any such text message in his deposition testimony, and Middleton noted that Neace did not respond to the text. [R. 52, p. 98:5–7 (Middleton Depo.)]; [R. 48 (Neace Depo.)]. But even assuming Neace saw and read the text messages, those messages clearly stated that Farthing *was* breathing, and Weaver also explained in his response text that Farthing had previously been seen by Poynter and was supposed to be taking breathing treatments, and Weaver would speak with Farthing that morning.  [R. 63-14 (Middleton Text Messages)]. From these facts and Neace's limited interactions with (and information about) Farthing, a reasonable fact finder could not find that Neace was aware of facts from which he could infer a substantial risk of serious harm. *See generally Kosloski*, 347 F. App'x at 180 (explaining that individual supervisor defendants could not be held personally liable when they had no personal involvement in responding to the inmate's requests for medical care and no actual knowledge of his heightened risk of exposure to endocarditis).

Moreover, even if Neace had perceived such a risk, the text messages indicate that Weaver (the designated medical liaison) was handling the situation. *See* [R. 63-14 (Middleton Text Messages)]. The messages also indicate that Farthing had seen Poynter and had been prescribed treatments. *Id.* There is no indication that Neace had any reason to believe that Weaver or Poynter were mistreating or ignoring Farthing. Thus, there is no evidence indicating that Neace responded unreasonably to Farthing's situation, based on the facts available to Neace, nor do Plaintiffs make that argument. *See generally Winkler*, 893 F.3d at 901 ("[T]his court has made clear that it is not 'unconstitutional for municipalities and their employees to rely on medical judgments made by [private] medical professionals responsible for prisoner care." (quoting *Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004)) (internal quotation marks omitted); *see also McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (explaining that non-medical professional defendants were entitled to rely on the medical professional defendants' determinations, and the only exception to this rule occurs when the non-medical defendant has reason to believe that the medical professionals are mistreating or failing to treat the inmate (citations omitted)).

In sum, the Court finds that a reasonable jury could not find that Neace was presented with sufficient facts from which he could draw the inference that there existed a substantial risk of serious harm to Farthing. And even assuming that Neace was presented with sufficient facts from which he could have perceived such a risk, there is no evidence whatsoever that Neace actually drew that inference, or that he disregarded that risk. Without these essential elements, the subjective prong fails with respect to Neace. The Court will therefore grant summary judgment in favor of Neace on Plaintiffs' § 1983 deliberate indifference claim.

### b. Defendant Dewayne Weaver (Assistant Director of BCDC)

Regarding Defendant Weaver, the BRRC Defendants argue that "the information available to Weaver did not include any facts from which he could have inferred that Farthing was experiencing, or even at risk for, endocarditis or any other serious medical condition." [R. 47, p. 20]. Instead, the defendants argue, Farthing's symptoms resembled the flu, Farthing himself suggested that he had the flu, and a medical professional (Poynter) concluded that Farthing likely had the flu. *Id.* The BRRC Defendants also argue that, even assuming there were facts from which Weaver could have inferred a substantial risk of serious harm to Farthing, "there is no evidence from which a reasonable jury could conclude that Weaver actually drew that inference." [R. 47, p. 24]. Instead, they argue, the undisputed evidence demonstrates that "Weaver at all times believed that Farthing had the flu." *Id.* Lastly, the BRRC Defendants argue that, even if Weaver drew the requisite inference, he did not consciously disregard the risk. *Id.* at 25. Instead, they argue, he acted reasonably by signing Farthing up for a sick call visit with Poynter and relying on Poynter's judgment and treatment plan. *Id.*

In response, Plaintiffs point to the following facts: "Weaver did not call Poynter when Farthing, who looked ill, asked Weaver to put his name on the sick call list to see Poynter long before Poynter's next visit to the center"; Farthing appeared sicker on January 21, 2020 than he had when he asked to be placed on the sick call list, but Weaver did not advise Poynter of this; Weaver did not call Poynter when Farthing met with Weaver (after meeting with Middleton) on the morning of January 24, 2020.[9] [R. 63, p. 20–21]. Plaintiffs do not explain the relevance of

---

[9] Plaintiffs also state that Weaver failed to call Poynter after Lewis told Weaver that Farthing was sick and needed help. [R. 63, p. 20]. Plaintiffs do not cite to any citation in the record to support these factual assertions. Further, Plaintiffs suggest that Weaver was untruthful when he testified that Farthing had not asked to see a doctor or nurse, but they do so without justification or explanation. *Id.* at 21.

any of these facts, nor do Plaintiffs attempt to address the specific elements of their deliberate indifference claim against Weaver.

Turning to the first element, the Court finds that no reasonable factfinder could conclude that Weaver subjectively perceived facts from which he could have inferred a substantial risk of serious harm to Farthing. Weaver saw Farthing shortly after his arrival at BCDC in December 2019, at which point Farthing advised Weaver of his recently broken arm (but no other symptoms). [R. 49, p. 37:2–4, 12–14 (Weaver Depo.)]. Weaver was also present during Farthing's December 10, 2019 appointment with Poynter, during which Farthing complained of no other health issues besides his arm pain. [R. 55, p. 24:14–15 (Poynter Depo.)]. At this appointment, Poynter informed Farthing that his elbow had not healed properly and prescribed medication for the pain. *Id.* at 26:13–21; [R. 47-6]; [R. 47-7 (Medication Administration Record)]. From these initial interactions, no reasonable factfinder could conclude that Weaver subjectively perceived facts necessary to infer a substantial risk of serious harm.

Sometime between January 7, 2020 and January 21, 2020, Farthing told Weaver that he "was feeling sick" and was "feeling pretty bad," and he thought he had the flu. [R. 49, p. 78:25, 79:1, 80:14–25, 81:1 (Weaver Depo.)]. Weaver testified that Farthing looked "like he was not feeling well but not, like, extremely, extremely unwell." *Id.* at 81:2–4. Weaver placed Farthing on the "sick call list" to see Poynter at his next visit to BCDC, which was scheduled for January 21, 2020. *Id.* at 78:10, 79:3. Weaver did not see Farthing again until that scheduled medical visit. *Id.* at 82:3–10, 84:4–12. At some point, Lewis also allegedly "brought [Farthing] up" to Weaver (and Middleton), and they confirmed that Poynter would take care of Farthing. [R. 63-1, pp. 21:18–23, 43:10–17 (Lewis Depo.)].

- 32 -

At the January 21, 2020 medical appointment, Weaver thought that Farthing looked "mostly the same as the last time I saw him, but maybe he's just still—just still sick. You could tell that he had a cold or something." [R. 49, p. 84:1–3 (Weaver Depo.)]. However, Weaver also testified that "you could tell he was sicker" than when Weaver had last seen him. *Id.* at 113:9. He also testified that Farthing was "able to enter [the exam room] under his own power . . . but you could see that he was feeling flu-like symptoms and effects of someone that would, you know, have the flu." *Id.* at 113:9–14. Weaver also noted that Farthing was "really tired acting, how all of us would be if—if we had the flu." *Id.* at 114:15–16.

Weaver was present during the exam, where Farthing explained to Poynter that had "been sick for maybe a couple of weeks." [R. 55, p. 31:15–16 (Poynter Depo.)]; *see also* [R. 47-8]. He stated that he would cough until he vomited, but he "wasn't really sick at his stomach." [R. 55, p. 31:16–19 (Poynter Depo.)]. He also told Poynter that he was achy, sometimes ran a low-grade fever, and had experienced "some" nausea, vomiting, and diarrhea, over the past week, as well as a decreased appetite. *Id.* at 31:20–22, 33:10–18; [R. 47-8]. He also advised Poynter that he was wheezing because he had asthma. [R. 55, p. 32:5–8 (Poynter Depo.)]. Poynter ultimately determined that Farthing "likely had [the] flu," prescribed medications (including breathing treatments), and instructed Farthing to let Weaver know if his symptoms worsened or if he was not feeling better within twenty-four to forty-eight hours. *Id.* at 37:15, 48:10–14. Weaver was present during this entire interaction with Poynter. *See, e.g.*, *id.* at 48:15–18; [R. 49, p. 83:18–20, 111:15–17 (Weaver Depo.)].

On the morning of January 24, 2020, Middleton texted Weaver that "Farthing is stating he can't breathe. He is panting quite a bit but is breathing." [R. 63-14 (Middleton Text Messages)]. By the time Weaver arrived, Farthing's breathing had "normalized." [R. 52, p.

91:10–11 (Middleton Depo.)]. Weaver met with Farthing in his office and observed that Farthing was walking "under his own power, unaided, unassisted." [R. 49, p. 126:6–7 (Weaver Depo.)]. Farthing advised that he was still feeling sick and "was having issue just kind of getting his breath." *Id.* at 130:3–5. Weaver asked Farthing about his medications and specifically, his breathing treatments, and he asked Farthing why he had never come by to pick up his nebulizer. *Id.* at 126:9–20. Farthing had no explanation for why he had failed to pick up the nebulizer. *Id.* at 126:20–22. Weaver gave the nebulizer to Farthing and made sure that Farthing took one of the nebulizer treatments before leaving his office. *Id.* at 126:22–25. During this January 24, 2020 interaction, Farthing appeared to be in 'the same condition" as Weaver had observed during the medical appointment with Poynter on January 21, 2020. *Id.* at 127:8–13. Farthing did not request to go to the hospital or see a doctor, nurse, or other medical professional. *Id.* at 127:14–22, 132:22–23.

Finally, on the evening of January 24, 2020, Perry called Weaver and advised that Farthing appeared yellow and was complaining that his breathing treatments were ineffective, and that he needed to go to the hospital. [R. 50, pp. 99:25, 100:1–4 (Perry Depo.)]. Weaver called Poynter and explained Perry's concerns, and Poynter advised that Farthing "needs to go to the hospital right now." [R. 49, p. 148, p. 3–12 (Weaver Depo.)]. Weaver called Perry and advised that Farthing "needed to go to the [emergency room] immediately." *Id.* at 149:21–22.

From this evidence, no reasonable fact finder could conclude that Weaver perceived facts from which he could infer a substantial risk of serious harm to Farthing prior to the January 24, 2020 phone call from Perry. Farthing presented with flu-like symptoms, including shortness of breath, and Farthing even expressed his own belief that he had the flu. *See, e.g.*, *id.* at 78:25, 79:1, 80:14–25, 81:1. When Farthing wheezed during his January 21, 2020 medical exam, he

brushed it off as an asthma flare up. *See* [R. 55, p. 32:2–8 (Poynter Depo.)]. There is no evidence that Weaver was ever subjectively aware of any other more serious condition. *See Britt*, 531 F.Supp.3d at 1334 (finding that no reasonable juror could conclude that official's conduct constituted deliberate indifference where the inmate "exhibited behavior and symptoms that were entirely consistent with heroin withdrawal and his self-reported mental health issues). "Nor is there any evidence that [Weaver] was capable of making such a determination." *Id.*

Moreover, Weaver was present during Farthing's medical exam, where Poynter, a medical professional, determined that Farthing likely had the flu and prescribed various medications to combat that illness. There is no evidence that Weaver knew or believed that Poynter's diagnosis and treatment plan were anything but correct. *See McGaw v. Sevier Cnty., Tenn.*, 715 F. App'x 495, 497 (6th Cir. 2017) ("None of the officers had medical training, and there is no evidence that they knew or believed that Nurse Sims's diagnosis was anything but correct."). When Farthing met with Weaver a few days later, Farthing complained that he was still sick and still having trouble breathing, but he admitted that he had failed to take his breathing treatments as prescribed. Weaver supplied the nebulizer treatments per Poynter's instructions and made sure that Farthing did one of the nebulizer treatments in his office. *See id.* at 498 (finding that officers did not act with subjective deliberate indifference when they followed a nurse's instruction). Weaver testified that, during that meeting, Farthing still looked sick but was in "the same condition" as he had been on January 21, 2020. Further, Farthing did not request to see a doctor or other medical professional. And importantly, Plaintiffs do not address this element of their claim, nor do they cite to any evidence suggesting that Weaver subjectively perceived a substantial risk of serious harm to Farthing prior to receiving the January 24, 2020 phone call from Perry.

Further, even assuming that Weaver was aware of sufficient facts from which he could have perceived a substantial risk of serious harm to Farthing, there is no evidence whatsoever that Weaver actually drew such an inference prior to Perry's phone call. Weaver testified that Farthing appeared to have "a cold or something," and "could see that [Farthing] was feeling flu-like symptoms and effects of someone that would, you know, have the flu." [R. 49, pp. 84:1–3, 113:9–14 (Weaver Depo.)]. Upon receiving the January 24, 2020 text message from Middleton, Weaver responded and referred to Farthing's recent appointment with Poynter and his failure to take his nebulizer treatments. [R. 63-14 (Middleton Text Messages)]. At most, these facts indicate that Weaver believed Farthing had the flu (or something similar) and that his failure to take his breathing treatments had contributed to his breathing difficulties. There is nothing to suggest otherwise. And again, the Court notes that Plaintiffs do not cite to any facts to suggest that Weaver inferred a substantial risk of serious harm to Farthing. Plaintiffs do not even address this element.

Lastly, even assuming that Weaver was aware of facts from which he could perceive a substantial risk of serious harm and he actually drew that inference, the evidence of record fails to demonstrate that he consciously disregarded that risk. Weaver signed Farthing up for a sick call visit prior to January 21, 2020, and attended to Farthing on the morning of January 24, 2020, at which time Weaver made sure that Farthing was taking his medications, including his breathing treatments. Upon learning that Farthing's condition had worsened to the point that Farthing appeared yellow, Weaver immediately called Poynter and then relayed Poynter's instructions to Perry as soon as possible. On this point, Plaintiffs suggest that Weaver could have called Poynter earlier, perhaps when Farthing first complained of being sick (prior to the January 21, 2020 appointment) or on the morning of January 24, 2020. [R. 63, pp. 20–21]. True, this

might have been the better course of action, and the failure to call Poynter on these occasions might amount to negligence[10]—but more is required to succeed on a deliberate indifference claim. Plaintiffs must demonstrate that Weaver *consciously disregarded* a substantial risk of serious harm to Farthing. *See, e.g.*, *Love*, 30 F. App'x at 338 ("A prison official is deliberately indifferent when he acts with criminal recklessness, a state of mind that requires that he act with a conscious disregard to a substantial risk of serious harm to the prisoner." (citing *Farmer*, 511 U.S. at 837)). Plaintiffs have not done so.

In sum, the Court finds that a reasonable jury could not find that Weaver was presented with sufficient facts from which he could draw the inference that there existed a substantial risk of serious harm to Farthing. And even assuming that Farthing was presented with sufficient facts from which he could have perceived such a risk, there is no evidence whatsoever that Weaver actually drew that inference, or that he consciously disregarded that risk. Without these essential elements, the subjective prong fails with respect to Weaver. The Court will therefore grant summary judgment in favor of Weaver on Plaintiffs' § 1983 deliberate indifference claim.

### c.  Defendant Mark Middleton (Phase Coordinator of BCDC)

As to Defendant Middleton, the BRRC Defendants first note that Middleton, a phase coordinator, is not responsible for residents' medical care. [R. 47, p. 25]; *see also* [R. 52, p. 34:1–2 (Middleton Depo.)]. Instead, if Middleton believes that an inmate might need medical care, he refers the inmate to Weaver. [R. 52, p. 47:8–22 (Middleton Depo.)]. Defendants next point out that, prior to January 24, 2020, Middleton's interactions with Farthing were limited to a brief encounter during the intake process and the occasional crossing of paths on the BCDC campus. [R. 47, p. 25]; [R. 52, pp. 93:18–25, 94:1–6  (Middleton Depo.)]. Defendants next turn

---

[10] The Court is dismissing Plaintiffs' state law claims and makes no ruling on Plaintiffs' negligence claims against Weaver or any other defendant.

to the events of January 24, 2020, and recite many of the facts already outlined in this opinion and discussed below. [R. 47, pp. 25–26]; *see also supra*, Section I(C)(8). Having recited these facts, Defendants argue that "Middleton is entitled to summary judgment because there were no facts available to him from which he could have inferred that Farthing had a serious medical need"; "there is no evidence that Middleton actually drew an inference that Farthing was suffering from a serious medical need"; and "to the extent Middleton knew Farthing was experiencing any symptoms, he did not consciously disregard those symptoms." [R. 47, p. 29].

In response, Plaintiffs make the following two-sentence argument: "Before Friday morning, Lewis overheard Farthing begging Middleton to take him to a doctor or to a hospital, with no success. Friday morning, when Farthing was discolored and struggling for breath, Middleton told him he was having a 'panic attack' and passed him off to Weaver." [R. 63, p. 21].

Plaintiffs again fail to cite to those portions of the record upon which they rely, and the record does not support their statements. On this point, the Court notes that Lewis's testimony does not create a clear timeline of events, and he even acknowledged that he was "not good with days and . . . not good with times." [R. 63-1, p. 18:11–12 (Lewis Depo.)]. Nevertheless, when asked if he had overheard Farthing ask Middleton for the doctor "prior to" Friday, January 24, 2020, Lewis responded, "Yes. He begged him. He was in tears begging him to go to the hospital, saying he couldn't breathe." *Id.* However, from a full review of Lewis's deposition testimony, it appears that Lewis was actually referring to the conversation he overheard on the morning of Friday, January 24, 2020. *See, e.g.*, *id.* at 25:3–10, 47:4–20. For example, when asked specifically about the January 24, 2020 exchange between Middleton and Farthing, Lewis stated, "Mr. Farthing was begging him to take him to the doctor. He said, 'And I can't breathe. Please, do something. Please, God, do something.'" *Id.* at 49:4–16.

- 38 -

Nevertheless, the Court acknowledges that Lewis testified to other earlier conversations with Middleton about Farthing (although Plaintiffs do not appear to rely on these conversations for support, *see* [R. 63, p. 21]). For example, Lewis testified that he "brought [Farthing] up" to Defendants Weaver and Middleton. [R. 63-1, p. 21:18–23 (Lewis Depo.)]. He also testified that, shortly before Farthing's January 21, 2020 sick call visit, he told Middleton "that [Farthing] wasn't looking good, and he really needed some help," and Middleton responded that Farthing would see Poynter. *Id.* at 20:18–24, 21:6–13.

Plaintiffs next contend that "Farthing was discolored and struggling for breath" on the morning of Friday, January 24, 2020, and "Middleton told him he was having a 'panic attack' and passed him off to Weaver." [R. 63, p. 21]. First, there is no evidence that Farthing appeared discolored during his conversation with Middleton on January 24, 2020. Second, the evidence demonstrates that Middleton did more than just "pass[] [Farthing] off to Weaver," as Plaintiffs suggest. [R. 63, p. 21]. Middleton immediately sat down with Farthing and instructed him on his breathing until Farthing was breathing calmly, and Middleton also brought Farthing a glass of water. [R. 52, p. 90:21–25, 91:1–3 (Middleton Depo.)]. Middleton then texted Weaver and Neace, per the BCDC medical procedures. *Id.* at 91:7–9; [R. 63-14 (Middleton Text Message)]; [R. 47-4, p. 5 (BDCD Operations Manual Excerpt)]. He was then advised by Weaver that Farthing had received medical care from Poynter and was supposed to be taking breathing treatments but had not picked up his nebulizer. [R. 63-14]. Middleton waited with Farthing until his breathing appeared "normalized" and Weaver arrived, and only then did he leave Farthing in Weaver's care. [R. 52, p. 91:10–11, 91:12–13 (Middleton Depo.)].

Having corrected Plaintiffs' characterization of the record, the Court notes that there still exists some dispute as to what was said between Farthing and Middleton on the morning of

January 24, 2020. Middleton testified that Farthing told him, "Mark, I'm scared, I can't breathe," and Farthing appeared panicked. *Id.* at 90:8, 93:13. Lewis also testified that Farthing told Middleton that he could not breath, and he further testified that both he and Farthing told Middleton that Farthing needed to go to the hospital. [R. 63-1, p. 48:7–11, 49:4–16 (Lewis Depo.)].  Lewis testified that Middleton told Farthing, "You're having a panic attack." *See, e.g.*, *id.* at 23:22–23. Middleton did not testify that he believed Farthing was having a panic attack or that he made any such statements, or even that Lewis spoke to him that day. *See* [R. 52 (Middleton Depo.)]. Lewis acknowledged that Middleton did not look at or speak to him while Lewis was speaking, and Lewis was sitting "so many seats" away from Middleton and Farthing. [R. 63-1, p. 49:4–11 (Lewis Depo.)].

Even assuming the truth of Lewis's testimony, the evidence of record does not indicate that Middleton was aware of facts from which he could have inferred a substantial risk of serious harm.  Prior to January 24, 2020, Lewis let Middleton know that Farthing looked unwell and needed help, but Middleton believed that Farthing would see Poynter and be taken care of. *Id.* at 20:18–24, 21:6–13. There is no evidence that Middleton knew of any specific symptoms or conditions at that time. On the morning of January 24, 2020, Middleton testified that he "didn't notice anything out of . . . the ordinary" beyond Farthing's breathing, which he described as very heavy and quick. [R. 52, p. 90:6–7 (Middleton Depo.)].  Middleton also testified that he did not hear "any kind of gurgling, or wheezing, or any obstruction, or anything like that." *Id.* at 93:13–16. Further, Farthing did not advise Middleton of any medical conditions or symptoms that he was experiencing. *Id.* at 93:5–11. And the evidence of record suggests that Farthing's breathing quickly improved and eventually "normalized" as he sat with Middleton. *Id.* at 90:21–25, 91:1–7, 91:10–11. Middleton therefore had no reason to believe that Farthing needed immediate

- 40 -

medical attention, even though Lewis and Farthing may have stated that Farthing needed to go to the hospital. Their statements were contradicted by Middleton's own observations.

And even assuming that Middleton was presented with facts from which he could infer a substantial risk of serious harm, there is no evidence indicating that Middleton did, in fact, draw the inference. According to Lewis, Middleton believed that Farthing was having a panic attack. [R. 63-1, p. 23:22–23 (Lewis Depo.)]. And Middleton was eventually informed by Weaver that Farthing was being treated for his breathing issues and had failed to take his treatments as directed. [R. 63-14 (Middleton Text Messages)]. Middleton testified that the text messages from Weaver, which he understood to be about "flu symptoms and . . . breathing treatments," caused him to check on Farthing before he left for the day.  [R. 52, p. 92:5–11 (Middleton Depo.)]. When checking on Farthing, Middleton suggested that Farthing sleep in an inclined position, the same thing Middleton does when he has "allergy issues." *Id.* at 92:13–16. At most, these facts demonstrate that Middleton initially believed Farthing was having a panic attack and then, upon receipt of more information from Weaver, he believed Farthing had the flu or at least something similar to allergies, and he had failed to follow through with his breathing treatments.

As just explained, no reasonable juror could find that Middleton perceived facts from which he could infer a substantial risk of serious harm or that he did, in fact, draw that inference. The Court acknowledges, however, that the facts surrounding Middleton may present a closer call than the other defendants, at least with respect to these first two elements of the subjective prong. Regardless, even assuming that Middleton inferred that Farthing was at substantial risk of serious harm, there is no evidence suggesting that Middleton's response was unreasonable. When presented with Farthing's breathing issues on the morning of January 24, 2020, Middleton acted immediately to calm Farthing's breathing, and he was successful. [R. 52, p. 90:5–25 (Middleton

Depo.)]. He also reached out to both Weaver (the designated medical liaison) and Neace for further guidance, per BCDC medical guidelines. *See* [R. 63-14 (Middleton Text Messages)]; [R. 47-4, p. 5 (BDCD Operations Manual Excerpt)].  Weaver responded and explained that Farthing had already seen Poynter, and that he (Weaver) would speak with Farthing that morning. [R. 63-14]. Middleton waited with Farthing until Weaver arrived and took Farthing into his office. [R. 52, p. 91:10–13 (Middleton Depo.)]. Middleton even checked on Farthing later that day, at which point Farthing advised that he was feeling better, though he felt worse at night. *Id.* at 92:10–13. Middleton attempted to provide a solution (sleeping in an inclined position) and told Perry to keep an eye on Farthing. *Id.* at 92:13–16. From these facts, a reasonable factfinder could not conclude that Middleton acted unreasonably.

At most, the evidence of record demonstrates that Middleton "addressed the risk that he did perceive" by sitting Farthing down and talking to him until his breathing returned to normal, and further, by contacting Weaver and confirming that Farthing had already seen Poynter and would follow up with Weaver that same morning. *See Winkler*, 893 F.3d at 876. Middleton then waited with Farthing until Weaver arrived and took over. This does not suggest a conscious disregard of a substantial risk of serious harm to Farthing's health, *see id.*, and Plaintiffs fail to cite any other facts or law demonstrating otherwise.

In sum, the Court finds that a reasonable jury could not find that Middleton was presented with sufficient facts from which he could draw the inference that there existed a substantial risk of serious harm to Farthing. And even assuming that Middleton was presented with sufficient facts from which he could have perceived such a risk, there is no evidence that Middleton actually drew that inference, or that he disregarded that risk. Without these essential elements,

the subjective prong fails with respect to Middleton. The Court will therefore grant summary judgment in favor of Middleton on Plaintiffs' § 1983 deliberate indifference claim.

### d.  Defendant Joseph Perry (Monitor at BCDC)

With respect to Defendant Perry, the BRRC Defendants consider both his January 20 or 21, 2020 interaction with Farthing and his January 24, 2020 interaction. *See* [R. 47, p. 33]. The details of these encounters are discussed in greater detail above. *See supra*, Sections I(C)(5), (10). To briefly summarize, Perry observed Farthing during his rounds on January 20 or 21, 2020 and asked Farthing and other inmates how they were doing. [R 50, p, 70:20–21 (Perry Depo.)]. Farthing responded that he was sick, but he did not request assistance or ask to see Weaver or a doctor, and Perry noticed nothing unusual about Farthing's appearance. *Id.* at 70:20–25, 71:1–7. Perry assumed Farthing had allergies, the flu, or a cold and did not inquire further. *Id.* at 71:7– 11. Regarding this first interaction, Defendants argue that "there were no facts available to Perry from which he could have inferred that Farthing had a serious medical issue, nor is there any evidence that Perry actually drew an inference at that point that Farthing was suffering from a serious medical issue." [R. 47, p. 33].

The second interaction involved Perry's observations of Farthing during the evening headcount on January 24, 2020, when Perry noticed that Farthing appeared yellow. [R. 50, p. 90:1–13, 92:1–3 (Perry Depo.)]. Perry recognized that this "was serious," and told Farthing to meet him after headcount. *Id.* at 92:4–7, 90:14–15. Upon meeting with Farthing after headcount, Perry contacted Weaver, who in turn contacted Poynter. *Id.* at 93:6–8. After Poynter advised that Farthing should be taken to the hospital, Perry immediately transported Farthing to the nearby hospital. *Id.* at 100:20–22, 102:5–8. Regarding this second interaction, Defendants concede that

Perry inferred that Farthing had a serious medical need, but they argue that he responded reasonably to that need. [R. 47, p. 33].

Defendants have therefore "inform[ed] the district court of the basis for [their] motion, and identif[ied] those portions of" the record that they believe demonstrates an *absence* of a necessary element of the deliberate indifference claim. *Celotex Corp.*, 477 U.S. at 323. The burden is therefore on Plaintiffs to produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc.*, 48 F.3d at 205 (citation omitted).

To satisfy this burden, Plaintiffs argue that Perry had numerous opportunities to observe Farthing's condition prior to the 9:00 p.m. headcount on January 24, 2020; Perry knew but did not tell anyone that Farthing was sick prior to calling Weaver that evening after the headcount; Perry did not document Farthing's yellow appearance in his monitor log, but instead only noted that Farthing was having trouble breathing; and Perry was told by other residents that Farthing had been sick for a while as Perry waited on Weaver to call back. [R. 63, p. 20–21].

Plaintiffs do not explain the relevance of any of this information. *Id.*  Plaintiffs appear to argue that Perry could have perceived facts from which he could draw the inference of a substantial risk of harm to Farthing earlier than January 24, 2020, and that he consciously disregarded such risk by failing to report Farthing's illness prior to January 24th. But Plaintiffs do not cite to any facts from which Perry could have perceived a substantial risk of serious harm to Farthing. On this point, Plaintiffs state that "Lewis said Farthing was so 'yellow looking' when he [Farthing] arrived at BCDC that he [Lewis] asked him whether he had hepatitis, and '[h]e just kept getting worse and worse and worse.'" [R. 63, p. 21]. They also state that Weaver thought Farthing was pale and discolored on January 21. *Id.* at 21–22. But these statements are

- 44 -

not supported by the record.  Lewis testified that Farthing appeared "a little yellow looking" upon arriving at BCDC, and Lewis asked if he had hepatitis because it had been "going around" other correctional facilities. [R 63-1, p. 10:5–8]. More importantly, Plaintiffs cite to no evidence that *Perry* ever observed Farthing as yellow, unusually pale, or otherwise discolored prior to the January 24, 2020 interaction. *See Burwell*, 7 F. 4th at 466 (explaining that the Court must consider the individual defendants' conduct "based on the information that was available to them at the time," and "information available to one defendant may not be automatically imputed to the other[]" defendants). At most, Farthing told Perry during the January 20 or 21, 2020 interaction that he was sick, but Perry observed no other symptoms or medical issues from which to conclude that Farthing suffered from anything more than allergies, the flu, or a cold. [R. 50, p. 72:7–15 (Perry Depo.)]. In fact, Perry testified that he assumed that Farthing had "allergies or the flu or a cold . . . something like that. Something very minor," that would not "necessarily entail" a doctor's visit. *Id.* at 71:7–11.

On these facts, Perry is comparable to Captain Trickler in *Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018). In that case, Trickler was distributing medications when he observed the inmate sitting at a table in his cell. *Id.* at 897. The inmate appeared ill, but "there was no indication that [the inmate] was unable to move or that anything else about [the inmate's] appearance alerted Captain Trickler to the seriousness of his condition" (a perforated ulcer). *Id.* Trickler inquired into the inmate's condition "by asking him what was wrong," to which the inmate replied that he was experiencing withdrawal and "really going through it." *Id.* According to Trickler, the inmate's appearance was consistent with someone going through withdrawal. *Id.* Trickler did not report the incident because the inmate did not request to see medical staff and other inmates in the cell advised that the inmate was scheduled to see the doctor that day. *Id.* The

- 45 -

Sixth Circuit held, "Nothing in these facts supports a finding that Captain Trickler perceived that [the inmate] was facing a substantial risk of serious harm that required immediate medical attention." *Id.* Further, Trickler's failure to report the incident under these circumstances "does not suggest a conscious disregard of a substantial risk of serious harm to [the inmate's] health." *Id.* at 897–98. Applying the same reasoning to the similar facts in this case, the Court finds that no reasonable factfinder could conclude that Perry perceived that Farthing was facing a substantial risk of serious harm that required immediate medical attention, and his failure to report that Farthing was sick under these circumstances does not suggest that he consciously disregarded any risk of harm to Farthing's health.

Turning to the evening of January 24, 2020, the Court finds that a reasonable fact finder *could* conclude that Perry perceived facts from which he could draw the inference that Farthing was at a substantial risk of serious harm, and he did, in fact, draw that inference. For example, Perry testified that he observed Farthing's yellow skin tone, and while he "had no idea" what it meant, he "knew it was serious." [R. 50, p. 90:11–13, 92:1–7 (Perry Depo.)]. He also testified that he "could see something was wrong, obviously, because [Farthing] was yellow." Id. at 93:3–5. Additionally, Defendants do not dispute that "Perry inferred that Farthing had a serious medical need" during the January 24, 2020 interaction. [R. 47, p. 33].

A reasonable juror could not conclude, however, that Perry consciously disregarded that risk. Upon observing Farthing's yellow appearance, Perry told Farthing to meet him immediately after head count. [R. 50, p. 90:14–15 (Perry Depo.)]. Farthing did not do as directed, however, so Perry took steps to find Farthing and call for him over the intercom. *Id.* at 91:23–25, 92:8–10. Farthing explained that he had been taking his breathing treatments but was still having trouble breathing, though he was not "gasping for breath or anything like that." *Id.* at 93:1–2. Farthing

did not request to see Weaver, but nevertheless, Perry contacted Weaver and advised him of Farthing's condition. *Id.* at 93:6–8, 99:25, 100:1–4. Within two minutes of hearing back from Weaver, Perry was escorting Farthing to the emergency room at the nearby hospital. *Id.* at 102:5–8.

Based upon these facts, a reasonable juror could not conclude that Perry consciously disregarded a substantial risk of serious harm. *See Love*, 30 F. App'x at 338 ("A prison official is deliberately indifferent when he acts with criminal recklessness, a state of mind that requires that he act with a conscious disregard to a substantial risk of serious harm to the prisoner." (citing *Farmer*, 511 U.S. at 837)); *Williams v. Berry*, No. 3:13-CV-1020 JD, 2013 WL 6237866, *4 (N.D. In. Nov. 27, 2013) ("Although it might have been possible for staff to act quicker, Williams has not alleged anything approaching deliberate indifferent to his medical needs. Instead, when custody staff was alerted to his injury, they took immediate steps to assess the seriousness of the injury and then to determine how best to obtain medical care for Williams . . . ."); *Solis v. Gatson*, No. W-13-CV-375, 2016 WL 9686992, *9 (W.D. Tex. June 22, 2016) ("Defendants addressed Plaintiff's complaints—he was taken to the infirmary for evaluation by a nurse and was eventually taken to a hospital emergency room. Had Defendants acted with deliberate indifference, no action would have been taken at all. The mere fact that Plaintiff wanted them to act quicker or to respond in a different manner is insufficient to state a claim for deliberate indifference to his serious medical needs.").

To be clear, Plaintiffs do not argue that Perry's actions on the evening of January 24, 2020 were unreasonable. In fact, with respect to Perry's actions on the evening of January 24, 2020, Plaintiffs argue only that (1) Perry failed to document Farthing's yellow skin tone in his monitor log; and (2) after Perry called Weaver, other inmates told Perry that Farthing had been

sick for a while. [R. 63, p. 20–21]. Plaintiffs again fail to explain the relevance of these points. These facts arose after Perry inferred a substantial risk of serious harm to Farthing, and after he took action to get Farthing medical care. The Court therefore finds that the Plaintiffs have failed to satisfy their burden of identifying "specific portions of the record upon which it seeks to rely to create a genuine issue of material fact" with respect to this issue. *In re Morris*, 260 F.3d at 655 (emphasis added).

In sum, the Court finds that a reasonable jury could not find that Perry was presented with sufficient facts from which he could draw the inference that there existed a substantial risk of serious harm to Farthing prior to the evening of January 24, 2020, nor is there any evidence suggesting that Perry did, in fact, draw such an inference prior to that date. With respect to the evening of January 24, 2020, the Court finds that a reasonable jury could find that Perry perceived facts from which he could draw the inference that Farthing was at a substantial risk of serious harm, and he did, in fact, draw that inference. No reasonable jury could conclude that Perry consciously disregarded that risk, however. As a result, the subjective prong of Plaintiffs' deliberate indifference claim against Perry fails. The Court will therefore grant summary judgment in favor of Perry on Plaintiffs' § 1983 deliberate indifference claim.

### C.  Plaintiffs' § 1983 Claim Against BRRC

Plaintiffs also assert a § 1983 claim against BRRC.[11] [R. 1, ¶ 18–20]. A private entity like BRRC may be held liable under § 1983 when that entity contracts with the state to perform a traditional state function. *West v. Atkins*, 487 U.S. 42, 54 (1988).[12] When considering a § 1983

---

[11] Though the defendants seem to believe that the § 1983 claim is asserted against the individual BRRC Defendants in their official capacities as well, *see, e.g.*, [R. 47, p. 30], the Court notes that the Complaint only names these defendants in their individual capacities. *See* [R. 1, pp. 1–2].

[12] The Court again notes that BRRC contracts with the KDOC for the operation of BCDC, *see* [R. 47-2 (KDOC Contract)], and the parties do not dispute that BRRC is subject to suit under § 1983.

claim against a private entity, a court should undertake the same analysis for § 1983 claims against municipalities. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (citation omitted). A municipality generally cannot be held liable under § 1983 "[i]f no constitutional violation by the individual defendants is established." *Watkins*, 273 F.3d at 687 (citation omitted). Under the holding in *Watkins*, because the evidence does not support Plaintiffs' § 1983 claim against the individual BRRC Defendants, BRRC cannot be held liable under § 1983. *See also North*, 754 F. App'x at 389 ("There must be a constitutional violation for a § 1983 claim against a municipality to succeed—if the plaintiff has suffered no constitutional injury, his *Monell* claim fails." (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))).

But even assuming that a municipality (or, in this case, a private entity contracting with the state) can be held liable under § 1983 in the absence of individual liability, *see North*, 754 F. App'x at 389–90; *Winkler*, 893 F.3d at 899–903, Plaintiffs' claim against BRRC would still fail. To succeed on such a claim, Plaintiffs must "show that the municipality itself [or here, BRRC], through its acts, policies, or customs, violated [Farthing's] Eighth Amendment rights by manifesting deliberate indifference to his serious medical needs." *North*, 754 F. App'x at 391 (citation omitted). A plaintiff can "show the existence of a municipal [act, policy, or custom] leading to the alleged violation" by identifying "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Winkler*, 893 F.3d at 901 (quoting *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015)) (internal quotation marks omitted).

Plaintiffs' arguments on this issue are disjointed and unclear. *See, e.g.*, [R. 63, pp. 18–20, 23–24]. From the best the Court can tell, Plaintiffs' argument is that BCDC "shorted its

- 49 -

residents' medical care" in an effort "[t]o reduce costs," [R. 63, p. 3], and this, in turn, "effectively produced a culture of indifference to residents' serious medical needs." *Id.* at 18. The Court therefore understands that Plaintiffs have attempted to identify an informal custom (rather than a formal policy) as the basis for imposing § 1983 liability against BRRC. Plaintiffs also seem to rely on a failure-to-train theory *id.* at 23–24, and perhaps even a custom of tolerance or acquiescence of federal violations. *Id.* at 18–20. The Court addresses each in turn.

### 1. Custom

"[A] plaintiff pursuing an affirmative policy or custom claim against a municipal entity must (1) show the existence of a policy, (2) connect that policy [or custom] to the municipality, and (3) demonstrate that his injury was caused by the execution of that policy [or custom]." *North*, 754 F. App'x at 390–91 (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). The plaintiff need not identify a formal policy; instead, a plaintiff may identify a custom "that has not been formally approved by an appropriate decision maker" but which nevertheless may "fairly subject a municipality on the theory that the relevant practice is so widespread as to have the force of law." *Id.* (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 403–04). A custom "may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Memphis, Tenn. Area Local, American Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) (citation omitted).

To demonstrate that BCDC "shorted its residents' medical care," Plaintiffs argue that BCDC often admitted inmates without having a record of their medical history or current medical condition; Poynter visited BCDC only once every other week; BCDC monitors were not trained on how to attend to residents' medical needs; Weaver was not medically trained; Weaver failed to document his calls with Poynter or his interactions with residents regarding their

medical care; residents had to ask Weaver to be put on the sick call sheet; and only a certain number of residents could sign up per sick call sheet. *Id.* at 3–4. Plaintiffs also allege that BCDC resisted sending residents to the hospital, denied residents' requests to go to the hospital, or drove them to the hospital (rather than having them ride in an ambulance) in order to "reduce costs." *Id.*

Plaintiffs suggest that these policies and procedures are not as stringent as those for other correctional facilities. *See* [R. 63, p. 19 (citing R. 63-12, Sweeney Depo.)]. But BCDC is not a correctional facility like a jail or prison; it is a reentry center, or a "supervised community residential facility." *See* KRS § 441.005(9); [R 47-2 (KDOC Contract)]. As such, it is governed by state statutes and regulations specific to reentry centers. *See* KRS § 441.146 (Operation of Reentry Center for Eligible Inmates); KRS § 441.148 (Administrative Regulations Prescribing Standards for Operation of Reentry Centers). Plaintiffs do not allege that BCDC's policies and procedures fail to satisfy those regulations. In fact, from the best the Court can tell, Plaintiffs do not argue that the above-cited procedures are, on their face, unreasonable. Instead, Plaintiffs argue that these various procedures created a "culture of indifference to residents' serious medical needs" at BCDC. [R. 63, p. 18]. In other words, Plaintiffs argue that BRRC's procedures resulted in a custom of deliberate indifference to the resident's right to adequate medical care.

To demonstrate this "culture of indifference," Plaintiffs cite to two incidents involving other BCDC residents. *Id.* First, a former monitor at BCDC, Travis Howard, testified that an older resident once had trouble breathing, and Howard and Perry could not reach Weaver and felt that they could not "go straight to the hospital or anything like that." [R. 63-6, p. 16:22–25, 17:1–13 (Howard Depo.)]. On another occasion, a resident complained of chest pain, so Perry contacted Weaver at the resident's request. [R. 50, p. 114:20–25, 115:1-21 (Perry Depo.)].

Weaver presumably contacted Poynter and was told that the resident did not need to go to the hospital, as Poynter had already seen him and provided medication for him. *Id.*

But Plaintiffs fail to explain how these two isolated incidents are evidence of a practice "so widespread as to have the force of law." *Ford*, 535 F.3d at 495. And even assuming that Plaintiffs could establish such a widespread practice and sufficiently connect that practice to BRRC, they must still demonstrate that Farthing's injury "was caused by the execution of" the custom at issue. *North*, 754 F. App'x at 390–91. As the Supreme Court has explained,

> it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Ford*, 535 F.3d at 497 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 404). Thus, the "key inquiry" is whether, in viewing the alleged custom in the light most favorable to Plaintiffs, a reasonable jury could find "a direct causal link" between that custom and the alleged denial of Farthing's right to adequate medical care. *Id.* (citations omitted); *see also Blackmore*, 390 F.3d at 900 ("A municipality can be liable under 42 U.S.C. § 1983 only if the plaintiff can demonstrate that his civil rights have been violated as a direct result of that municipality's policy or custom." (citation omitted)).

Plaintiffs completely fail to explain how the alleged custom of "short[ing] [BCDC] residents' medical care" in an effort "[t]o reduce costs," [R. 63, p. 3], has any causal link to the alleged denial of Farthing's right to adequate medical care. At most, Plaintiffs suggest that BCDC should have kept records of all residents' medical history and current medical conditions; paid a medical professional to visit BCDC more than once every two weeks; kept better records of residents' medical issues; and allowed more residents to sign up for sick call visits, or perhaps

instituted a different process for signing up for sick call visits. *Id.* at 3–4. Plaintiffs also seem to suggest that perhaps there should have been a different procedure for receiving medical care other than contacting Weaver or Neace. *Id.* But Plaintiffs completely fail to explain how a different procedure would have resulted in a different outcome in this case.

Moreover, the record does not support such a conclusion. Upon meeting Farthing on December 10, 2019, Poynter took a brief medical history and specifically asked Farthing whether he had a history of intravenous drug use, something Farthing twice denied. *See* [R. 55, p. 24:9–13 (Poynter Depo.)]; [R. 49, p. 119:9–14, 122:7–17 (Weaver Depo.)]. Plaintiffs fail to cite to any evidence of record suggesting that BCDC would have gained knowledge of Farthing's intravenous drug use by keeping better records of Farthing's medical history or his medical issues. Nor do Plaintiffs explain how a different procedure for signing up for sick call visits or more frequent sick call visits would have changed the outcome in this case. Plaintiffs do not cite to any evidence suggesting that Farthing was unable to sign up for a sick call visit, and the evidence of record instead indicates that, when Farthing approached BCDC staff about his symptoms, he was, in fact, placed on the sick call list. *See, e.g.*, [R. 49, p. 78:10, 79:1–3 (Weaver Depo.)]. And while more frequent sick call visits might have allowed Farthing to see Poynter prior to January 21, 2020, Plaintiffs fail to explain how the infrequency of sick call visits in any way contributed to the injury in this case. Lastly, to the extent Plaintiffs suggest that BRRC should have implemented a different procedure for receiving medical care other than contacting Weaver or Neace, they have failed to cite to any evidence that a different procedure would have resulted in Farthing being transferred to the hospital any sooner. At most, Plaintiffs have suggested that BRRC should have implemented a policy allowing residents to call for an ambulance themselves, rather than seek approval from a staff member. *See* [R. 63, p. 4]. But "the

fact that alternative procedures might have better addressed a prisoner's particular needs does not show that [BRRC] was deliberately indifferent to his medical needs." *Ford*, 535 F.3d at 497–98 (quoting *Graham*, 358 F.3d at 384). The Court therefore finds that Plaintiffs have failed to show that, "through its *deliberate* conduct, [BRRC] was the "moving force" behind the injury alleged. *Id.* at 497.

Thus, even if a reasonable jury could find that Plaintiffs have identified a policy or custom and sufficiently connected that policy or custom to BRRC, they have failed to "demonstrate that [Farthing's] injury was caused by the execution of that policy [or custom]." *North*, 754 F. App'x at 390–91 (citation omitted). To the extent Plaintiffs rely on an affirmative policy or custom to establish § 1983 liability against BRRC, their claim fails.

### 2.   Failure to Train

To succeed on a failure-to-train theory, Plaintiffs must demonstrate "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of [BRRC's] deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902; *see also North*, 754 F. App'x at 386. Plaintiffs' arguments on this issue are so undeveloped and disjointed that the Court struggles to understand what training the Plaintiffs believe to be lacking. *See* [R. 63, p. 23–24]. To the extent Plaintiffs intended to rely on this theory, their argument is wholly undeveloped, and the Court considers it waived. *See Brown v. Astrue*, No. 09-387-HRW, 2010 WL 4878866, *3 (E.D. Ky. Nov. 24, 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citing *McPherson v.*

*Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Regardless, this argument is without merit, for the reasons explained herein.

Plaintiffs first seem to focus on the limited number of "sick call" days available to BCDC residents (one every other week) and the limited medical training for BCDC staff (i.e., basic first aid and CPR). [R. 63, p. 23]. In the background section of their brief, they also briefly allude to the fact that BCDC monitors "received no training on how to attend to the residents' medical needs," *id.* at 3, and that "BCDC administrators lacked the medical training to determine whether something a resident believed was a medical emergency was not." *Id.* at 4. But Plaintiffs do not expand upon these points or explain their relevance. Instead, Plaintiffs take issue with the fact that Weaver did not call Poynter each and every time an inmate had a medical issue, and that on other occasions, "residents' requests to be taken to the emergency room were refused, even though the staff couldn't tell whether the resident was having an emergency or not." *Id.* at 23–24. From the best the Court can decipher, Plaintiffs are attempting to argue that BCDC staff members were inadequately trained on what constituted a medical emergency, or in other words, when to call an ambulance without seeking preapproval from Weaver and/or Poynter.

But even assuming that Plaintiffs could demonstrate inadequate training, Plaintiffs must also prove that the inadequacies were the result of BRRC's deliberate indifference. Plaintiffs can make such a showing in one of two ways. First, Plaintiffs "can show a pattern of similar constitutional violations by untrained employees and [BRRC's] continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees." *North*, 754 F. App'x at 386 (quoting *Shadrick*, 805 F.3d at 738–39). For example, "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed

deliberately indifferent if the policymakers choose to retain that program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted). Plaintiffs do not cite to this standard or argue for its application.[13]

Instead, Plaintiffs appear to rely on the second mode of proof. *See id.* at 24. Under this method, Plaintiffs can show BRRC's deliberate indifference by "establish[ing] a single violation of federal rights, accompanied by a showing that [BRRC] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Id.* (quoting *Shadrick*, 805 F.3d at 738–39). "This second mode of proof is available in a narrow range of circumstances where a federal rights violation may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *North*, 754 F. App'x at 386 (quoting *Shadrick*, 805 F.3d at 738–39). For example, this type of "single-incident liability" is generally available where a plaintiff alleges "inadequate training of nurses in a correctional setting." *Id.*; *see also Shadrick*, 805 F.3d at 739.

Plaintiffs cite to this method of proving deliberate indifference. *See* [R. 63, p. 24]. However, they do not explain how the facts of this case support this argument; they cite only generally to case law involving police and medical professionals. *Id.* (citing *City of Canton, Ohio v Harris*, 489 U.S. 378, 390 (1989); *Rice v. Montgomery Cnty., Ky.*, No. 5:14-181-KKC, 2016 WL 2596035, *14 (E.D. Ky, May 5, 2016).  Without further explanation, they argue that "[a] reasonable jury could find [BRRC] deliberately indifferent given the evidence in this case." *Id.*

---

[13] To the extent Plaintiffs intended to rely on this mode of proving deliberate indifference, their argument is wholly undeveloped, and the Court considers it waived. *See Brown v. Astrue*, No. 09-387-HRW, 2010 WL 4878866, *3 (E.D. Ky. Nov. 24, 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

Again, from the best the Court can tell, Plaintiffs argue that BCDC staff members should have received training on what constitutes a medical emergency. *See* [R. 63, pp. 3–4, 23–24]. Presumably, Plaintiffs are suggesting that BCDC staff members are so frequently presented with residents' emergent medical issues that "a federal rights violation may be a highly predictable consequence of a failure to equip [BCDC] with specific tools to handle [such] recurring situations." *North*, 754 F. App'x at 386 (quoting *Shadrick*, 805 F.3d at 738–39). But this ignores the fact that BCDC residents must "[b]e physically and psychologically capable of functioning in the reentry center without ongoing professional intervention." [R. 47-1, pp. 2–3]. In fact, the KDOC conducts a medical screening a few days prior to the inmate's transfer to a reentry center to ensure that this qualification is met. *See, e.g.*, [R. 48, p. 24:12–16, p. 25:12–17 (Neace Depo.)]. It therefore seems highly unlikely that BCDC staff members are so frequently called upon to address medical emergencies that a federal rights violation is a highly predictable consequence of failing to train them on such situations.

Nevertheless, Plaintiffs briefly reference the two other incidents involving BCDC residents (discussed in more detail above). *See* [R. 63, pp. 24]; *supra* Section III(C)(1). To the extent Plaintiffs cite to these two isolated incidents as evidence that BCDC staff members frequently face medical emergencies, the Court finds that argument to be wholly undeveloped and unpersuasive. At most, these incidents demonstrate that BCDC staff faced alleged medical emergencies only on exactly two occasions. Simply put, Plaintiffs have not explained nor cited to any evidence suggesting that BCDC staff members face "recurring situations presenting an obvious potential for a constitutional violation," such that BRRC can be held liable for failing to train on such situations.

Plaintiffs also seem to suggest that Weaver should have been better trained on when a resident's medical issues warranted a call to Poynter. *Id.* at 23. For example, Plaintiffs argue that Weaver failed to call Poynter on at least three occasions involving BCDC residents, but Plaintiffs again failed to cite to the portions of the record upon which they rely, and their statements are not supported by the record.[14] Regardless, the fact that "a particular officer may have been unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Harris*, 489 U.S. 390–91 (citations omitted). And even if Plaintiffs could point to evidence that Weaver failed to call Poynter regarding an inmate's medical needs on more than one occasion, it does not suffice to show that "an otherwise sound program has occasionally been negligently administered." *Harris*, 489 U.S. at 391.

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Id.* at 391. Instead, Plaintiffs must demonstrate that BRRC's failure to train "reflects deliberate indifference to the constitutional rights of its" residents. Plaintiffs have failed to do so.

Plaintiffs' failure to demonstrate deliberate indifference is fatal to their failure-to-train theory. It is settled law that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a

---

[14] For example, in one example cited by Plaintiffs, the evidence indicates that Weaver did call Poynter, who advised him that the resident did not need to go to the hospital. [R. 50, p. 114:20–25, 115:1-21 (Perry Depo.)]. In the other example, BCDC staff attempted to contact Weaver but were unable to reach him. [R. 63-6, p. 16:22–25, 17:1–13 (Howard Depo.)].

shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 816 (6th Cir. 2005) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)) (internal quotation marks omitted). Thus, "[m]ere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability." *Id.* (citing *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998)). "To adopt lesser standards of fault . . . would open municipalities to unprecedented liability under § 1983," and would essentially "result in *de facto respondeat superior* liability on municipalities," something the Supreme Court has expressly rejected. *Harris*, 489 U.S. at 391–92; *see also Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 693–94 (1978).

Moreover, even assuming that Plaintiffs could demonstrate inadequate training and that the inadequacy was the result of BRRC's deliberate indifference, Plaintiffs must still demonstrate that "the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902; *see also Harris*, 489 U.S. at 391; *North*, 754 F. App'x at 386, *Britt*, 531 F. Supp. 3d at 1342. In other words, Plaintiffs must show that "the deficiency in training actually caused the [BRRC staff's] indifference to [Farthing's] medical needs." *Harris*, 489 U.S. at 391. At best, Plaintiffs have claimed that BCDC staff should have been better trained to identify medical emergencies. They have failed to explain, however, how the allegedly deficient training resulted in an indifference to Farthing's medical needs. Here, Farthing presented with flu-like symptoms, and BCDC staff referred him to Poynter for treatment of those symptoms. On one other occasion, he presented with heavy breathing similar to a panic attack, but his breathing quickly normalized. There is no evidence suggesting that BCDC staff overlooked a true medical emergency (i.e, something that might warrant calling 911) at any time, such that better training

might have changed the outcome here. *See id.* ("Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"). Thus, Plaintiffs have failed to demonstrate that any inadequacies in training were "closely related to or actually caused [Farthing's] injury." *Winkler*, 893 F.3d at 902. On this point, the Court again notes that Plaintiffs have completely failed to develop their arguments on this theory.

The Court therefore finds that Plaintiffs have failed to demonstrate that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of [BRRC's] deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902; *see also North*, 754 F. App'x at 386. Thus, to the extent Plaintiffs rely on a failure-to-train theory to impose § 1983 liability against BRRC, their deliberate indifference claim fails.

### 3. Custom of Tolerating Constitutional Violations

The Court next considers whether Plaintiffs have "show[n] the existence of a municipal policy or custom leading to the alleged violation" by identifying "a custom of tolerance or acquiescence of federal violations." *Winkler*, 893 F.3d at 901 (quoting *Baynes*, 799 F.3d at 621) (internal quotation marks omitted). In other words, Plaintiffs can proceed on a § 1983 claim against BRRC by demonstrating that BRRC "had a custom of 'inaction' in the face of prolonged unconstitutional conduct" by its employees. *Winkler*, 893 F.3d at 902; *see also Britt*, 531 F.Supp.3d at 1339. To support such an argument, Plaintiffs must demonstrate:

> (1) "a clear and persistent" pattern of unconstitutional conduct by [BRRC] employees; (2) [BRRC's] "notice or constructive notice" of the unconstitutional conduct; (3) [BRRC's] "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation.

*Winkler*, 893 F.3d at 902 (quoting *D'Ambrosio v. Marino*, 747 F.3d 378, 387–88 (6th Cir. 2014)).

Plaintiffs fail to cite these elements, much less address them. Nevertheless, the Court understands that Plaintiffs have attempted to show a "custom" of deliberate in difference by citing to two prior incidents involving other BCDC residents. *See* [R. 63-6, p. 16:22–25, 17:1–13 (Howard Depo.)]; [R. 50, p. 114:20–25, 115:1-21 (Perry Depo.)]; *supra* Section III(C)(1) (discussing these incidents in more detail). But even assuming that these examples involve unconstitutional conduct, two isolated incidents do not establish a "clear and persistent pattern" of unconstitutional conduct by BCDC employees. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (explaining that "the plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference"); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (explaining that two instances of police misconduct did not "indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"). Further, Plaintiffs have not even attempted to establish that BRRC had actual or constructive notice of this allegedly unconstitutional conduct or explain how BRRC tacitly approved such conduct. And finally, Plaintiffs do not explain how these incidents, which were completely unrelated to Farthing's experiences at BCDC, were the "moving force" of the alleged constitutional violation in this case. Thus, to the extent Plaintiffs attempt to impose § 1983 liability against BRRC by demonstrating a custom of "inaction" in the face of prolonged unconstitutional arguments, their claim must fail.

In sum, Plaintiffs have failed to show that BRRC, "through its acts, policies, or customs, violated [Farthing's] Eighth Amendment rights by manifesting deliberate indifference to his

serious medical needs." *North*, 754 F. App'x at 391 (citation omitted). The Court again notes that Plaintiffs' arguments on this issue are undeveloped and unclear. The Court has attempted to decipher those arguments to the best of its ability, but ultimately, the Court finds that BRRC is entitled to summary judgment on the § 1983 deliberate indifference claim.

### D.  Plaintiffs' State Law Claims

Plaintiffs have also asserted a claim for negligence and/or gross negligence and a wrongful death claim against the BRRC Defendants and Defendant Poynter.[15] [R. 1, pp. 7–8]. Plaintiffs also assert a claim for loss of parental consortium against all remaining defendants. *Id.* at ¶ 23. However, when Plaintiffs filed this lawsuit, they invoked this Court's federal question jurisdiction. *Id.* at ¶ 2. Plaintiffs' § 1983 claim served as their sole basis for federal jurisdiction; the remaining state law claims were brought by invoking this Court's supplemental jurisdiction. *Id.* The Court has now concluded that no constitutional violations occurred and will grant summary judgment on Plaintiffs' § 1983 claim, as to all defendants.

When presented with such a scenario, "the Sixth Circuit has repeatedly held that 'a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.'" *Britt*, 531 F. Supp. 3d at 1343 (quoting *Rouster*, 749 F.3d at 454); *see also Winkler*, 893 F.3d at 905. Courts within this circuit have followed that guidance and dismissed a plaintiff's state law claims for negligence, medical malpractice, and wrongful death after granting summary judgment on the plaintiff's § 1983 deliberate indifference claims. *See, e.g.*, *Britt*, 531 F. Supp. 3d at 1343; *Winkler*, 893 F.3d at 905.

This practice "accords with principles of federalism." *Id.* (quoting *Rouster*, 749 F.3d at 454) (internal quotation marks omitted). For example, the Supreme Court and the Sixth Circuit

---

[15] As already explained, Plaintiffs concede their state law claims against Mills and their gross negligence claim against Poynter. *See* [R. 63, p. 14 n.83]; *id.* at 9 n.58; *supra* Section III(A).

have explained that "[n]eedless decision of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Rouster*, 749 F.3d at 454 (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) (internal quotation marks omitted). And the Supreme Court has further cautioned, "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Gibbs*, 383 U.S. at 726 (citation omitted).

Furthermore, in the present case, Plaintiffs' state law claims and the parties' arguments "implicate complex questions regarding the relevant standard of care" applicable to privately employed staff at a reentry center that contracts with the state, and whether such individuals may assert a state-law qualified immunity defense. *See Britt*, 531 F.Supp.3d at 1342. The Court notes that these issues involve questions of state law, and with respect to the qualified immunity issues, the parties have failed to fully develop their arguments.

Accordingly, pursuant to 28 U.S.C. § 1367, the Court declines to exercise its supplemental jurisdiction over these remaining state law claims (Counts II, III, and IV).

## IV. CONCLUSION

This case presents a tragic set of facts. The specific question before the Court, however, is whether the plaintiffs have "marshaled facts, based on admissible evidence, from which a reasonable juror could find the [defendants] are liable for his death." *Britt*, 531 F.Supp.3d at 1317. For the reasons stated above, the Court finds that a reasonable juror could not view the evidence of record and conclude that the defendants were deliberately indifferent to Farthing's serious medical needs in violation of the Eighth Amendment. The Court will therefore grant summary judgment in favor of BRRC and Defendants Neace, Weaver, Middleton, and Perry on

Plaintiffs' § 1983 deliberate indifference claim (Count I). The Court will also grant summary judgment in favor of Defendant Mills and Defendant Poynter on the deliberate indifferent claim (Count I) based on Plaintiffs' concessions. [R. 63, p. 14, n.83]; *id.* at 9, n.58. Lastly, for the reasons stated above, the Court declines to exercise its supplemental jurisdiction over the remaining state law claims (Counts II, III, IV).

Accordingly, **IT IS HEREBY ORDERED** as follows:

1. The Motion for Summary Judgment filed by Defendants Bluegrass Regional Recycling Corporation, Michael A. Mills, Dewayne F. Weaver, Darrell Neace, Mark Middleton and Joseph Perry, [**R. 47**], is **GRANTED IN PART** and **DENIED IN PART**.

   a. The motion is **GRANTED** to the extent these defendants seek dismissal of Plaintiffs' deliberate indifference claim (Count I). These defendants are entitled to judgment in their favor on Plaintiffs' § 1983 claim for deliberate indifference (Count I).

   b. The motion is **DENIED** to the extent these defendants seek judgment in their favor on Plaintiffs' remaining state law claims for negligence/gross negligence (Count II), wrongful death (Count III), and loss of parental consortium (Count IV).

2. The Motion for Summary Judgment filed by Defendant Timothy Poynter, [**R. 56**], is **GRANTED IN PART** and **DENIED IN PART**.

   a. The motion is **GRANTED** to the extent Defendant Poynter seeks dismissal of Plaintiffs' deliberate indifference claim (Count I). Defendant Poynter is

entitled to judgment in his favor on Plaintiffs' § 1983 claim for deliberate indifference (Count I).

    b.  The motion is **DENIED** to the extent Defendant Poynter seeks dismissal of Plaintiffs' remaining state law claims for negligence/gross negligence (Count II), wrongful death (Count III), and loss of parental consortium (Count IV).

3.  Plaintiffs' remaining state law claims (Counts II, III, and IV) are **DISMISSED WITHOUT PREJUDICE** as to all Defendants.[16]

4.  A separate judgment shall follow.

This the 29th day of September, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

---

[16] As previously noted, Plaintiffs concede their state law claims against Mills and their gross negligence claim against Poynter. *See* [R. 63, p. 14 n.83]; *id.* at 9 n.58; *supra* Section III(A).

- 65 -